**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SUMMER CAMPBELL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:23-cv-5101 |
| | ) | |
| LIBERTY MUTUAL | ) | |
| INSURANCE, | ) | Jury Trial Demanded |
| | ) | |
| | ) | |
| Defendant. | ) | |

## **COMPLAINT**

Plaintiff Summer Campbell ("Plaintiff" or "Campbell"), by and through her attorney, Loftus & Eisenberg, Ltd., for her Complaint against Defendant Liberty Mutual Insurance ("Defendant" or "LM"), alleges as follows:

### **INTRODUCTION**

1. Campbell is a woman with a mental disability who was hired by LM on April 12, 2021, as a technical assistant in payments. On or about January 31, 2022, Campbell became an associate account analyst within LM after having applied for the position. Despite Campbell's contributions and service to LM, the company engaged in unlawful discrimination and retaliation based on her mental disabilities. LM's unlawful conduct directly led to Campbell's constructive discharge on February 6, 2023.

### **JURISDICTION AND VENUE**

2. Campbell's claims arise under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1 *et seq.,* as amended

by P.A. 98-1050 (Jan. 1, 2015). This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C § 1367.

3.  Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). LM operates in this District and maintains offices in this District, and the unlawful conduct alleged in this Complaint occurred in this District.

## PARTIES

4.  Plaintiff Campbell is an individual who resided in Oakwood Hills, IL during all relevant times. Campbell continues to reside in Oakwood Hills, IL.

5.  Defendant LM is a private corporation that is the fifth largest global property and casualty insurer and ranks 86 on the Fortune 100 list of largest US corporations. LM's headquarters are in Boston, Massachusetts, but they operate in each state, including Illinois, where the discrimination occurred.

6.  On LM's website, their "Commitment" page states, in part, "At Liberty Mutual, diversity is about all of us. We believe that recognizing, appreciating and applying the unique insights, perspectives and backgrounds of each person cultivates an atmosphere of trust and respect. It's also key to our success in engaging with all people and possibilities across differences. We work across all dimensions of diversity, including race, ethnicity, gender, LGBTQ+, military status, *people with disabilities*, and more... We also recognize that gender and race are not the only dimensions of diversity people identify with. We are all multidimensional, and we're committed to gaining a better understanding of all facets of diversity — such as veterans, LGBTQ+ and *those with disabilities.* That's why in 2021, we launched our self-ID program in the US, enabling employees to self-identify across several dimensions of diversity." (emphasis added).

2

## **FACTS**

7. Campbell is a young woman with several disabilities. In 2021, Campbell was diagnosed with Generalized Anxiety Disorder, Major Depressive Disorder Recurrent Moderate, Post-Traumatic Stress Disorder ("PTSD"), and Attention-Deficit Hyperactivity Disorder ("ADHD").

8. Campbell is currently pursuing a diagnosis for Autism, a process that can take over a year. Campbell has passed the Autism screening portion and scored "consistent with Autism," and has received a referral for a formal assessment.

9. Campbell began receiving treatment for anxiety, depression, and PTSD in April 2021, and treatment for ADHD in October 2021.

10. LM hired Campbell as a Technical Assistant in April 2021.

11. In early February 2022, shortly after Campbell started her new position at LM, she set up a phone call with her supervisor, Colleen Busby ("Busby"), to disclose her disabilities and inform Busby that she would be needing accommodations.

12. Busby quickly overtook the conversation and began asking Campbell intrusive questions about her disabilities, making Campbell extremely uncomfortable.

13. Busby informed Campbell that she originally intended to assign Campbell her own book of accounts, but now that she knew about Campbell's disabilities, her plans would have to change, and Campbell would instead have to be a "floater" on the team.

14. Busby was not aware of the details or possible limitations of Campbell's disabilities; yet she assumed Campbell would not be capable of managing her own accounts, which is why Busby decided it would be best for Campbell to instead be a "floater."

3

15. This position carried less responsibility, was unpredictable, and due to the nature of being a "floater," it would be difficult for Campbell to receive recognition for her work.

16. Even though Busby originally planned to give Campbell her own accounts, she ultimately never assigned any to Campbell because she assumed Campbell's disability would preclude her from handling her accounts autonomously and competently.

17. Busby's comments were incredibly disconcerting because they were overtly discriminatory and retaliatory. Busby's false assumption and decision to not give Campbell her own accounts were retaliatory actions based on Campbell's disability. These actions stunted her professional growth and took away an opportunity for Campbell to work more autonomously and have more responsibilities.

18. During this same conversation, Busby also expressed concerns about what other people might think or say about Campbell's disabilities, and asked Campbell how she planned to stop others from finding out about her disabilities.

19. These comments were incredibly inappropriate and discriminatory, as they suggested Campbell's disabilities were inherently shameful or embarrassing and warranted a plan of action to prevent others from learning about them.

20. These comments revealed Busby's biases against people with disabilities. Busby believed Campbell would be treated differently by her colleagues when they learned of her disability, the same way Busby had treated Campbell differently after she learned about her disabilities.

21. Busby also asked Campbell something to the effect of, "can you get over it in a few months?" "It" being her disabilities. This question was very offensive to Campbell; and it trivialized her serious, life-long disabilities.

4

22. When Campbell brought up her need for accommodations to Busby, Busby stated that formal accommodation requests would not be necessary, and that she could address Campbell's concerns "informally."

23. Throughout February and March of 2022, Campbell had daily training sessions with Senior Account Analyst Kat Stoner ("Stoner") to learn about pre-sale work on accounts, and overall training on how to approach daily tasks.

24. LM typically assigns one mentor for every new hire. However, Campbell was given two mentors—Stoner and Account Specialist Anneke Higgins ("Higgins").

25. Stoner would schedule sessions for one to two hours at a time but would often go over the allotted time by an additional one to two hours. Stoner did this without asking Campbell if she was comfortable going over the allotted time and required Campbell to work through her lunch break at times.

26. During this period, Busby would often cancel her weekly one-on-one meetings with Campbell and failed to reschedule them.

27. When Campbell was eventually able to meet with Busby, she informed Busby of the difficulties she was experiencing with Stoner and the way her mentors were training her.

28. Campbell shared how having to jump between multiple different trainers on multiple topics in one day was difficult for her due to her ADHD.

29. On March 29, 2022, Campbell met with Busby to finally address the difficulties she was having with her mentor's training structure and overall behavior.

30. Campbell also disclosed her status as neurodivergent[1] to her two mentors in an email. In this email, she detailed the specific issues she struggles with when learning.

---

[1] The term "neurodivergent" describes people whose brain differences affect how their brain works. That means they have different strengths and challenges from people whose brains don't have those differences. The possible

5

31. Campbell also took the initiative to generate a document that would help her mentors learn how to present information to Campbell in a way that was accessible to her and how her brain works.

32. Campbell asked that this template be used as part of her accommodations. Busby and Higgins acknowledged Campbell's email and complimented her for being vocal about her needs.

33. Busby even praised Campbell's template and sent it out to supervisors on other teams, proposing it be implemented for all new hires in the future.

34. However, Busby never once confirmed that Campbell's simple accommodation request would be granted.

35. Higgins complied with this request halfway, but Stoner never acknowledged the email and never complied with Campbell's accommodation request.

36. On April 21, 2022, Campbell submitted a formal request for ADA accommodations to LM's Human Resources ("HR") department after her accommodation requests went largely unaddressed.

37. Campbell also informed HR that Busby continued to make ableist comments to her. Some of these ableist comments were something to the effect of "you're too emotionally connected to your work. It's not a big deal, don't stress about it so much"; "you have to accept the training you are given. You can't expect people to adjust to you"; "everyone is a little ADHD"; "I'm on medication too, everyone struggles"; "your mentors wouldn't bully you, I know them. It's in your head"; "do you think you will feel better and be able to do your job after a bit of time? Or do you think you will always have anxiety?"; "I'm accepting of you, but I worry what other

---

differences include medical disorders, learning disabilities and other conditions. The possible strengths include better memory, being able to mentally picture three-dimensional (3D) objects easily, the ability to solve complex mathematical calculations in their head, and more.

people will think if they find out about your disabilities" and "how are we going to keep others from finding out about your disabilities?"

38. HR informed Campbell they would follow up with her in three to five business days. Campbell followed up with HR on April 28 and April 29, 2022, asking when she could expect an update. HR failed to respond.

39. On May 11, 2022, Case Associate III, Christine Ferretti ("Ferretti"), requested a meeting with Campbell to discuss her accommodations. Ferretti worked in the leave case management team within the Talent and Enterprise Services division of LM. This meeting was meant to be informative, whereby Ferretti would explain the accommodation process, collect information about Campbell's needs, and fill her in on next steps. Campbell was under the impression that she would work with Ferretti to discuss accommodation options, but Ferretti had no suggestions beyond a standing desk and ergonomic keyboard. HR refused to order Campbell's standing desk until she returned from short term disability leave ("STD"). However, by the time she returned, the standing desk was on backorder, and Campbell never received it at any point during her employment with LM.

40. During the meeting between Ferretti and Campbell, Campbell vocalized the difficulties she was having with her training process and with her manager, Busby.

41. Campbell explained how Busby continued to make comments and ask questions that offended Campbell and made her very uncomfortable. Some of these questions included something to the effect of "what medications are you on?; "how did you go about getting diagnosed, and what was your experience like?; and "do you have advice for my child?"

42. Busby asked whether Campbell had any advice for her child because, during the first few months of Campbell joining the team, Busby was starting to learn that her child might be

autistic. While Busby began the diagnosis process for her son around May 2022, she would ask Campbell questions nearly every single time they had a private conversation, conversations that were meant to discuss Campbell's career growth, not Busby's personal life.

43. When Campbell shared some of her everyday sensory struggles with Busby, which included tasks like taking a shower, feeding herself, remembering to go to the bathroom, and remembering to drink water, Busby expressed complete shock by saying comments to the effect of "I would never expect that from you!"; "you seem so put together, do you really struggle to even shower?"

44. In response to all that Campbell shared with Ferretti, Ferretti said they would work together to address Campbell's accommodation options and would look into connecting Campbell with the correct HR department to address Busby's discriminatory comments. Ferretti also asked Campbell to sign medical release paperwork so that her doctors could share confidential information with HR about Campbell's diagnoses and treatment history.

45. The following day, Busby met with Campbell for their second quarter check-in. Busby informed Campbell that she was performing well, and that Busby did not have any performance concerns about her. However, Busby again failed to discuss the ongoing and unaddressed challenges that Campbell was experiencing.

46. By June 23, 2022, over a month since Campbell first met with case associate Ferretti, Campbell's accommodation requests were still not fulfilled.

47. Campbell emailed Talent Operations Supervisor Caitlyn Heald ("Heald"), explaining the situation, and asking to be assigned to a new case associate, specifically one that had more experience in addressing disability accommodations for neurodivergent people. However, Heald refused to connect Campbell to a new case associate.

48. Busby herself had acknowledged to Campbell that there were many unexplained delays in the accommodation process, and Campbell's own doctors also stated that the accommodation process was not being conducted correctly.

49. Because Heald refused to connect Campbell to another case associate, Campbell was forced to go above Heald and contact the Manager of Talent Operations Michelle Warstler ("Warstler") to explain the situation and why Campbell needed her help.

50. On June 29, 2022, Warstler met with Campbell and acknowledged that Ferretti was not doing her job correctly, and that Campbell would be assigned to a new case manager, one who would ensure the process moved quickly, especially considering it had been two months since Campbell first made her official requests.

51. Campbell also informed Warstler about having told Ferretti about the offensive comments and questions from Busby, which was the second time she notified someone from HR about Busby's discriminatory actions.

52. While this entire process was taking place, Campbell consistently voiced her concerns about the inadequate training she had been receiving, being given incorrect information from her own mentors, having important questions go unanswered, feeling intentionally excluded by her mentors, and being verbally berated by another team's Manager over the phone.

53. These significant issues, coupled with Campbell's disabilities, made her very unwell and caused her to experience several mental health crises. Her progress in therapy continued to regress, and her therapists suggested she quit to protect her mental health from the unaccommodating environment.

54. On June 30, 2022, Warstler introduced Campbell to Complex Case Associate Jennifer Russ ("Russ"), who would be taking over Campbell's case.

55. Campbell met with Russ a few days later and walked Russ through everything that had happened to her to date, including Busby's offensive comments. In response, Russ stated she would look into connecting Campbell to the correct HR department to address her concerns and would work with Campbell on an expanded list of accommodations.

56. Around this time, Campbell asked Warstler if there were HR personnel who were better trained on working with neurodivergent disabilities. Warstler responded that there were no specialized individuals or teams of the sort.

57. Given that Busby was not properly managing Higgins or Stoner's refusals to implement Campbell's accommodations, Campbell felt she had no other choice but to disclose her diagnoses to her mentors. She hoped this would finally make them understand why these accommodations were so critical to her mental health.

58. Unfortunately, this only backfired, and the two mentors also made offensive and ableist comments to Campbell. They said something to the effect of, "you are so emotional over this stuff, you have to let it go," "everyone has a little ADHD," "you have to not care so much," "you haven't even made any mistakes yet, stop worrying." They even went so far as to ask if Campbell thought she would ever be able to overcome her disabilities and do the job, the same ableist and offensive question that Busby had also previously asked.

59. On July 29, 2022, over three months since Campbell first requested her accommodations to HR, she finally had to inform the company that she would be stepping away on FMLA leave due to the unmet support needs and the impact they had on her mental health over the last six months. Campbell specifically voiced her hope that she would be able to return from FMLA leave to a safe and accommodating environment in a few weeks.

60. Just 17 minutes after Campbell informed her manager about her decision to take leave, Russ was somehow able to expedite the approval of three accommodation requests from Campbell's list of four requests. What HR could not accomplish in three months was somehow accomplished within less than twenty minutes after Campbell informed the company that she would be taking FMLA leave.

61. The months leading up to Campbell's FMLA leave were detrimental to her mental and physical health. She had regular meltdowns, a symptom of her disabilities, was unable to eat or care for herself, and was encouraged by her therapist to quit her job at LM because of their failure to meet her reasonable accommodation requests.

62. Campbell was on FMLA leave from July 29, 2022, to January 25, 2023.

63. While on FMLA leave, Campbell worked with her therapist to create a second list of requested accommodations ("V2 accommodations"). This list was meant to address the necessary changes to Campbell's training that were previously not enforced by Busby, as well as to protect Campbell from Busby's inappropriate behavior. Campbell and her doctors informed Russ that it was imperative that Campbell return to work with accommodations in place to support her.

64. On September 19, 2022, Campbell reached out to Russ for an update on her review of the V2 accommodations and informed her that she would be returning to work in a few weeks. Campbell wanted to ensure that she would be returning to a safe work environment. Russ stated that the accommodations were still being reviewed and that she would like to schedule a call with Campbell to discuss the information Campbell's doctor put in the paperwork.

65. During a phone call between Campbell and Russ on September 22, 2022, Russ demonstrated her clear misunderstanding of the nature of Campbell's needs, and why her specific

accommodations were so necessary. Russ informed Campbell that Campbell should request these accommodations from a different HR department, claiming that Campbell's requests were not actual accommodations. Russ further suggested Campbell speak directly to Busby and ask for the changes to her training, claiming it was something that the two should be able to work out. Russ framed these issues as interpersonal problems, rather than difficulties that worsened Campbell's disabilities.

66. Russ insisted that she had never heard anyone request similar accommodations, and that Campbell should just take those concerns up with her manager.

67. Campbell pushed back on this by telling Russ that every accommodation she had requested came from the United States Department of Labor's Job Accommodation Network ("JAN") website and were specific to her disabilities. Campbell also reminded Russ that the nature of her disabilities made conversations about these issues extremely difficult, and further pointed out that she had asked Busby, her manager, to make changes to Campbell's training structure, but Busby never implemented them.

68. Campbell also took that moment to point out a second time to Russ that she was experiencing discrimination from Busby, and that Russ had previously promised to find Campbell someone to help, but never followed up.

69. This was the fourth time Campbell had brought up Busby's discriminatory behavior to HR. It was at that point that Russ suggested that Campbell take her accommodation requests to an HR department that was more relationship-centered.

70. Campbell had generated a document to show Russ that every requested accommodation she had been sending to a "relationship centered" HR person was a reasonable accommodation.

Campbell specifically requested that Russ continue to review *all* the accommodation requests Campbell's doctor had provided, to which Russ agreed.

71. Throughout the arduous process of Campbell attempting to access accommodations, she believed HR was acting in good faith to help her. HR repeatedly told Campbell they were working to educate themselves regarding her disabilities.

72. However, HR consistently failed on following through. Russ in particular essentially refused to investigate Campbell's reasonable accommodation requests by claiming the other HR department would fix the problem. This caused Campbell to feel unsafe with HR and their intentions. Campbell also experienced a great deal of paranoia, a symptom of her disabilities that is triggered when people's words do not align with their actions.

73. On September 27, 2022, Campbell was passed over to Associate Talent Operations Specialist Stephanie Falconer ("Falconer"). Campbell had to speak with Falconer and her associate, Heather Cote ("Cote") to discuss all of Campbell's concerns and unaddressed needs. The two informed Campbell they would be conducting an "investigation" into the issues.

74. On November 4, 2022, Campbell had a second meeting with Falconer and Cote to review their findings and offer "resolutions." Again, this conversation demonstrated HR personnel's significant lack of understanding regarding the nature of Campbell's disabilities and accommodation needs.

75. Falconer asked Campbell to "speak up for herself," give others the opportunity to improve their behavior, and share when she is uncomfortable in the moment—the very actions that someone with Campbell's disabilities has great difficulty doing. Once again, Campbell was forced to push back on Falconer's proposed resolutions and asked for HR to continue its investigation.

76. Falconer agreed with Campbell that her concerns had still not been resolved and assured her she would continue working towards addressing the issues so that Campbell would feel safe upon her return to work.

77. That same day, Campbell informed Russ that she had reached out to the legal aid organization for people with disabilities—Equip for Equality—and that their lawyer believed there was an unreasonable delay in providing Campbell with her accommodations.

78. Just a few minutes after Campbell disclosed this, Russ sent her a new set of approved accommodations from her V2 requested list. However, there were accommodation requests remaining that had neither been accepted nor denied. This was the second time HR expedited making approvals. The first time, it was after Campbell disclosed that she was going to utilize FMLA. This time, it was due to Campbell disclosing she had reached out to legal counsel. This demonstrates how easily HR could have granted Campbell's reasonable accommodations, but instead deliberately chose not to until Campbell informed LM that she had sought legal advice.

79. On or about November 11, 2022, Campbell emailed Warstler to escalate her concerns about the accommodation process. Campbell requested the accommodation of nonverbal communication for their conversation. Warstler denied this request under the excuse that the general accommodation process is not one that is conducted in writing.

80. Campbell was forced to verbally discuss her concerns with Warstler, even after having told her that verbal calls with HR continuously place her in a state of fear, stress, anxiety, and PTSD flashbacks that put her at a disadvantage when advocating for herself.

81. On or about November 16, 2022, Campbell emailed the CEO of Liberty Mutual, David Long ("Long"). She informed him of her experience up to that point, requested assistance in

receiving accommodations, and alerted him to her concerns about the accommodation process not being accessible or adequate for people with neurodivergent disabilities.

82. Long replied, stating that the accommodation of neurodivergent workers relied heavily on the support of individual managers. He escalated her concerns to the top of Chief People Officer ("CPO"), Jen Ughetta ("Ughetta") agenda, and Ughetta later replied simply telling Campbell to keep waiting for her current HR contacts to assist her.

83. On or about November 28, 2022, Campbell emailed Falconer with a summary of their November 4, 2022, conversation and laid out the next steps the two had agreed upon. Falconer replied a week later stating she had shared Campbell's concerns with Busby, closed Campbell's case, and that Campbell should verbally discuss any further issues with Busby.

84. Campbell replied to Falconer, asking for an explanation as to why her case was closed, how her concerns were resolved, and how she was supposed to feel safe returning to work.

85. Falconer repeatedly refused to answer these questions or re-open Campbell's case, even though Campbell continued to push the subject through January 19, 2023.

86. On or about December 1, 2022, Campbell asked Warstler for a copy of her job descriptions and essential functions ahead of their verbal call. Warstler failed to provide Campbell with this information until just 14 hours ahead of their 9 am call.

87. Additionally, the information Warstler provided included essential functions that Campbell had never seen before, as they were never provided to Campbell's doctor in previous paperwork.

88. Before she was scheduled to speak with Warstler, Campbell asked Warstler to explain where these essential functions came from, but Warstler never answered this question. It appeared

to Campbell that Warstler was attempting to slip in essential functions that would clash with her disabilities and make it look like Campbell could not perform her job's essential functions.

89. Campbell stated that she would not discuss the new essential functions until Warstler proved they were documented as essential prior to Campbell applying for the role. Warstler did not provide the requested evidence and stopped bringing up these false essential job functions.

90. Campbell later had her call with Warstler. On this call, Warstler asked extremely pointed questions about Campbell's accommodation requests. Campbell then reiterated her concerns about Busby's behavior towards her, and Russ' failure to help until Campbell brought up her concerns multiple times.

91. Additionally, Campbell explained to Warstler that Russ was clearly not educated on neurodivergent accommodations, given that she continuously denied Campbell's very reasonable requests and told her she should be able to talk to Busby directly about her "preferences."

92. After this call, Campbell sent Warstler an email summarizing their agreed-upon action items and provided written answers to all of Warstler's questions to protect herself. Campbell even offered to work alongside the company to expand their support for neurodivergent people in general.

93. On or about December 13, 2022, Warstler connected Campbell to Employee Relations Consultant II Molly Izard-Gibb ("Izard-Gibb") to address Campbell's ongoing concerns about Busby's discriminatory actions. Izard-Gibb was part of LM's Global Employee Relations & HR Policy department.

94. Campbell asked Warstler how Izard-Gibb was different from Falconer and asked why Campbell needed to retell her traumatic story to a fourth HR representative. Warstler never replied to this question.

95. This same day, Izard-Gibb reached out to Campbell to set up a verbal call. Campbell told her she would be prepared to discuss the discrimination from her manager, but that her concerns about the company-wide neurodivergent discrimination would need to be saved for another time, as it would take more than their scheduled hour to discuss both issues.

96. On or about December 15, 2022, Campbell and Izard-Gibb had a call to discuss Campbell's examples of discrimination. At the end of the call, Campbell asked her to schedule another meeting to discuss her concerns about the company-wide discrimination. Izard-Gibb promised to have this discussion, but she avoided scheduling this second conversation.

97. On or about January 9, 2023, Campbell asked Izard-Gibb for an update on her case, but Izard-Gibb refused to provide any information. Campbell informed her that she wanted information about the status of her case because she feared her upcoming return to work while having an open discrimination case against her manager. Moreover, Campbell wanted more information because the nature of her disabilities makes the unknown very triggering for her. Izard-Gibb repeatedly refused to offer any information, timeline, or comfort on the subject, thereby further worsening the symptoms of Campbell's disabilities.

98. On or about December 15, 2022, Warstler emailed Campbell the conclusion of her review. Warstler placed restrictions on the approved accommodations Campbell had previously received from Falconer and Russ. Warstler offered ineffective resolutions for previously unaddressed requests, and she even left some requests completely unaddressed.

99. On or about December 27, 2022, Campbell replied to Warstler's review by explaining how her offered accommodations were ineffective and did not comply with the ADA. Campbell also pointed out the accommodation requests that continued to go unaddressed. Warstler did not reply to this email and never addressed the document Campbell had made to explain how Warstler's offered accommodations were ineffective.

100. Campbell had reached out to Warstler multiple times between December 27, 2022, and January 25, 2023, and was now asking to continue their conversation about Campbell's accommodations and discuss her concerns about the HR process. Campbell copied LM's new CEO Timothy Sweeney ("Sweeney") and CPO Ughetta on these emails to Wartsler in an attempt to escalate her concerns.

101. Additionally, Campbell asked Warstler about what training HR and managers receive regarding ADA accommodations and how to support disabled workers, given that Long had previously stated that this was the most important part of supporting neurodivergent workers.

102. Warstler refused to reply to Campbell's emails until January 25, 2023.

103. Campbell returned to work the next day and Warstler emailed her to simply share that her case had been closed, and that any further concerns should be brought to Russ.

104. On January 26, 2023, Campbell returned to work, where Busby repeatedly refused to follow her approved accommodations, regularly put her into situations that Busby knew would worsen Campbell's symptoms, and attempted to paint Campbell as insubordinate when she refused to acquiesce to her discrimination.

105. On or about January 27, 2023, Campbell was in contact with Russ and attempted to continue the conversation that Warstler refused to have regarding the ineffective accommodations and remaining unaddressed accommodation requests. Campbell also asked

Russ to answer a few questions about how Campbell was supposed to feel safe returning to work, and how her year-end review would be conducted in the coming days    considering she *still* had an open discrimination investigation into her manager, Busby.

106. Russ claimed that all requested accommodations had been addressed and skirted around Campbell's questions, stating she would get back to her. When Campbell asked Russ to show her where in their communication had the last few requests been answered, but Russ never replied to this question. Russ did not get back to Campbell in a timely manner, and waited until February 3, 2023, to inform her that any questions about her year-end review should now be directed to Izard-Gibb.

107. On or about February 3, 2023, Campbell received an email from a new HR person, Preeti Gupta ("Gupta"), stating she would be attending a few meetings with Busby and Campbell to act as a support person for Campbell.

108. This came after Campbell refused to participate in a verbal call with Busby where she did not have a support person, and where permission to record the conversation was denied.

109. Campbell was never told why the accommodation of having a support person present, which had been denied to her for months, was suddenly available. Campbell was not offered the chance to meet Gupta before Gupta was scheduled to attend a meeting between Campbell and Busby. Without ever meeting her designated support person, Campbell was unsure how supportive Gupta could be.

110. On or about February 3, 2023, Izard-Gibb reached out to Campbell and asked her to get on a verbal call with her to discuss the problems she was having with Busby since returning to work.

111.    Campbell once again requested the accommodation of nonverbal communication, or the ability to record their call. Izard-Gibb initially refused both requests but later agreed to email Campbell instead of having a verbal call.

112.    Campbell informed Izard-Gibb of four occurrences over the past three weeks where she informed seven different LM employees of her fear and concerns around her return to work, and how every email went unaddressed. When Campbell also thanked Izard-Gibb for the nonverbal communication accommodation and requested that it be the standard going forward, Izard-Gibb threatened to not fully investigate Campbell's discrimination concerns if Campbell required the accommodation of nonverbal communication. This felt extremely coercive to Campbell, and she told Izard-Gibb that this threat was inappropriate and she would be taking her concerns to the EEOC for investigation.

113.    Izard-Gibb did not reply to this. Campbell did not hear from her again until February 27, 2023, when Izard-Gibb emailed her that her case was closed and that no discrimination from Busby towards Campbell had been found.

114.    On February 6, 2023, Campbell was constructively discharged from LM due to the company's hostility and refusal to provide her with reasonable accommodations, HR's continuous refusal to have productive conversations about her accommodation requests, Busby's refusal to respect Campbell's approved accommodations, Campbell's mental health decline, and the clear manipulation attempts made by everyone involved in the process to paint her as insubordinate.

115.    Campbell continues to experience emotional distress and heightened symptoms of her disabilities due to the triggering nature of LM's actions. Her PTSD flashbacks have increased,

and she experiences nightmares every night. Campbell also struggles with shame, and her self-image has decreased to the point of rarely leaving her house.

116.    Campbell still attends therapy twice a week in an effort to correct the regression in her PTSD recovery that she experienced due to LM's unlawful actions. She struggles to enjoy her personal life and was recently unable to celebrate her one-year wedding anniversary due to her ongoing panic attacks and meltdowns, symptoms of her disabilities.

117.    Campbell scheduled an inquiry interview with the EEOC in November 2022 and took the first available date of April 26, 2023.

118.    Campbell was fearful of being harassed into quitting before the scheduled interview and attempted to obtain an earlier appointment with the EEOC in January 2023. Unfortunately, Campbell was unable to move up the date and was forced to represent herself against LM in her final weeks before her constructive discharge.

119.    On April 26, 2023, Campbell was called an hour ahead of schedule and was asked to conduct her interview. In this meeting, Campbell expressed to the EEOC representative that verbal communication was difficult for her, that she had a prepared timeline to read from, and that she would best represent herself if she was allowed to work through events in chronological order.

120.    The EEOC representative initially agreed to this request but later asked Campbell to stray from her prepared notes. Campbell was assured that her timeline and all other evidence could be uploaded into the EEOC portal and would be reviewed. Near the end of the interview, the EEOC representative told Campbell that she "probably didn't have a case that the EEOC would take on" because it appeared that LM "accepted at least a few" requested accommodations. Campbell became emotionally overwhelmed by this but confirmed with the EEOC that her full

story would be heard through the evidence uploaded into the portal. The interview ended after an hour.

121.   Campbell signed the Charge of Discrimination (No. 2023CR1485, EEOC No. 440-2023-01671) on May 3, 2023, and began preparing to upload her evidence into the portal.

122.   On May 5, 2023, Campbell received a notice of case closure and a right to sue letter from the EEOC—all before Campbell uploaded any evidence into the portal. (Attached as Exhibit A.)

123.   Campbell reached out to the representative she spoke to on April 26, 2023, and asked how her case was closed after less than two business days and when she had not yet uploaded the timeline and evidence she was assured would be reviewed. The EEOC representative simply told Campbell that she could request an appeal and provide the additional evidence.

124.   Campbell did request an appeal, but this request was declined by the EEOC.

125.   Campbell continued her search for legal representation and was advised by an attorney she contacted to send her case to the IDHR for a second review. Campbell contacted the IDHR on May 12, 2023, and requested an investigation

## LEGAL CLAIMS

### Count I
### Violation of the Americans with Disabilities Act ("ADA")
### 42 U.S.C. §§ 12101 *et seq.*

#### A.  Discrimination under the ADA

126.   Each paragraph of this Complaint is incorporated as if fully restated herein.

127.   Title I of the ADA prohibits private employers with at least 15 employees from discriminating against qualified individuals with disabilities. 42 U.S.C. §§ 12111, 12112.

128.    LM employs more than 15 employees and is a covered "employer" within the meaning of the ADA. 42 U.S.C. § 12111(5).

129.    At all relevant times, Campbell was a qualified individual with a disability within the meaning of the ADA. 42 U.S.C. § 12111(8).

130.    Campbell was a covered "employee" within the meaning of the ADA. 42 U.S.C. § 12111(4).

131.    At all relevant times, Campbell had mental disabilities that substantially limited one or more major life activities and qualified as a disability under the ADA. 42 U.S.C. § 12102(1). The major life activities that were substantially limited due to Campbell's mental disabilities included caring for herself, concentrating, learning, speaking, thinking, working, interacting with others, and more.

132.    Campbell's disabilities include Generalized Anxiety Disorder, Major Depressive Disorder Recurrent Moderate, Post-Traumatic Stress Disorder, and Attention-Deficit Hyperactivity Disorder.

133.    At all relevant times, Campbell could perform the essential functions of her position with LM, with or without reasonable accommodations. The essential functions of Campbell's position included deconstructing insurance submissions by identifying, gathering, analyzing, and entering information; providing customer service to brokers and agents to facilitate the processing of business; executing post-sale management and workflow; and supporting the underwriter with mid-term account services. Busby also acknowledged that Campbell was performing well and was competent in her work. In fact, because Campbell could perform the essential functions of her job without accommodations, LM perceived them as not being necessary.

134.   LM took adverse employment actions against Campbell by limiting the job responsibilities she would have otherwise been assigned had she not disclosed her disabilities to Busby. They took further adverse employment actions by refusing to do a meaningful investigation into Campbell's claims.

135.   The basis for LM's constructive discharge of Campbell was based on unlawful discrimination.

136.   Similarly situated employees who do not have a disability were not subjected to adverse employment actions in similar circumstances.

137.   Campbell's disability was a motivating factor in LM's decision to limit the scope of Campbell's job responsibilities.

138.   As a direct and proximate result of LM's unlawful actions against Campbell, in violation of the ADA, she has suffered, and continues to suffer, monetary and emotional damages.

**A.  Failure to Accommodate under the ADA**

139.   Each paragraph of this Complaint is incorporated as if fully restated herein.

140.   LM was aware of Campbell's disabilities, as she had informed LM about them both over email and in person.

141.   Campbell requested several reasonable accommodations, and LM failed to provide them. These requested accommodations included nonverbal communication. If nonverbal communication was not possible, Campbell requested the ability to record conversations for trainings and informative meetings, and to have a support person available in the event that she became nonverbal, a symptom of her disability.

142.   LM refused these accommodations and stated that Underwriting Support Operations Manager, Kathy Tran ("Tran"), who was also Busby's supervisor, would sit in on meetings to

support Campbell. Campbell was resistant to this alternative accommodation, as she originally expressed to Falconer on November 4, 2022, but HR refused to discuss it any further.

143.    Even when Tran joined Campbell's meetings with Busby, Tran did not support Campbell and instead made her feel even more scared and uncomfortable. Instead, Tran and Busby overtook meetings, even though Campbell was specifically told she would be the one leading. The two seemingly teamed up against Campbell and attempted to get her to sign a document that outlined the expectations of everyone involved in Campbell's trainings.

144.    When Campbell asked questions before agreeing to sign the document, Tran cut her off. Tran told Campbell that she was bringing up inappropriate things (referring to Busby's intrusive questions and failure to support Campbell before she went on leave) that happened in the past. Tran attempted to get Campbell to agree to leave everything in the past and move on. This conversation took place while Campbell still had an open discrimination investigation against Busby. Campbell felt she was being coerced and pressured into signing documents and agreeing to no longer be impacted by the discrimination that was ongoing and still being investigated.

145.    During this meeting, Busby promised Campbell that she would not need to take notes, as Busby would be taking notes and would send them in a follow-up email after the call. However, Busby's follow-up email was missing important conversations from the meeting and appeared to be an attempt to control the narrative of the meeting.

146.    After that meeting, and after Busby sent the follow-up email leaving important information from the meeting undocumented in her notes, Campbell was not willing to be in a verbal call with Busby without it being recorded or having a trained support person there.

**Count II**
**Violation of the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq. (2004)**
**Discrimination Based on Disability**

147.     Each paragraph of this Complaint is incorporated as if fully restated herein.

148.     LM is an employer within the meaning of the IHRA. 775 ILCS 5/2-101(B)(1).

149.     At all relevant times, Campbell was an employee of Defendants as defined by the IHRA. 775 ILCS 5/2-101(A)(1)(a).

150.     At all relevant times, Campbell had a disability as defined by the IHRA. 775 ILCS 5/1-103(I). The Act defines "disability" as "a determinable physical or mental characteristic of a person, including, but not limited to, a determinable physical characteristic which necessitates the person's use of a guide, hearing or support dog, the history of such characteristic, or the perception of such characteristic by the person complained against, which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic. Includes any mental, psychological, or developmental disability, including *autism spectrum disorders."* 775 ILCS 5/1-103(I)(1)(e) (emphasis added).

151.     Campbell's disabilities, while significant, were unrelated to her ability to perform the duties of the job she was hired to perform. Campbell's disabilities had no impact on her ability to deconstruct insurance submissions by identifying, gathering, analyzing, and entering information; providing customer service to brokers and agents to facilitate the processing of business, executing post-sale management and workflow; and supporting the underwriter with mid-term account services.

152.     Campbell requested reasonable accommodations from LM, such as having nonverbal communication, recording trainings, neurodiversity awareness training for Campbell's team, and more.

153.    LM failed to provide the majority of the necessary accommodations Campbell requested.

154.    Campbell had taken the necessary steps to request accommodations, but LM, its managers, and HR personnel took an unreasonable amount of time to approve her requests and failed to provide the necessary accommodations in a timely manner.

155.    Busby took adverse actions against Campbell by limiting her responsibilities and regarding Campbell as incapable of performing her job duties competently because of her disabilities.

156.    As a result of LM's conduct, Campbell had to add a second therapist to her medical team and now sees two therapists and a psychiatrist.

157.    Campbell has experienced depression, anxiety, shame, guilt, nightmares, PTSD flashbacks, emotional flashbacks, fatigue, loss of sleep, headaches, weight loss, meltdowns, uncontrollable crying, suicidal thoughts, difficulty concentrating, panic attacks, chronic body aches, isolation, and self-harm.

<u>**Count III**</u>
**Violation of the Illinois Human Rights Act**
**Retaliation**

158.    Each paragraph of this Complaint is incorporated as if fully restated herein.

159.    Campbell engaged in numerous forms of protected activity during her employment with LM by requesting reasonable accommodations for her mental disabilities, calling attention to LM's discriminatory policies, and advocating for adequate training for those who manage or work with neurodivergent people.

160.    Campbell suffered multiple adverse employment actions because of her protected activity.

161. There is a causal connection between Campbell's protected conduct and LM's adverse action(s). After Campbell disclosed her disability to Busby, her job responsibilities were limited.

162. Busby further retaliated by canceling Campbell's one-on-one meetings with her, meetings that were required of her as a manager of a new hire. When Campbell was on leave, HR required Busby to do weekly check-in texts with Campbell, which Busby failed to do.

163. Campbell was also subjected to multiple offensive and discriminatory comments about her disability by her manager, her mentors, and even HR personnel.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court find in her favor and against Defendant as follows:

a. Declare that the acts and conduct of Defendants are unlawful;

b. Award Plaintiff the value of all compensation, benefits, and equity lost as a result of Defendants' unlawful conduct;

c. Award Plaintiff the value of all compensation, benefits, and equity she will lose in the future as a result of Defendants' unlawful conduct;

d. Award Plaintiff compensatory damages, including but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

e. Award Plaintiff punitive damages due to Defendants' malicious conduct and/or Defendants' reckless or callous indifference to the statutorily protected rights of Plaintiff;

f. Award Plaintiff prejudgment interest;

g. Award Plaintiff attorneys' fees, costs, and disbursements; and

h.      Award Plaintiff such other make whole equitable, injunctive, and legal relief as this

Court deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Plaintiff hereby requests a trial by jury with respect to any issues so triable.

Respectfully submitted,

Davina Rae DiPaolo
Loftus & Eisenberg, Ltd.
161 N. Clark, Ste 1600
Chicago, IL 60601
davina@LoftusandEisenberg.com

# Exhibit A



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## <u>DETERMINATION AND NOTICE OF RIGHTS</u>
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 05/05/2023

**To:** Mrs. Summer D. Campbell
107 N Shore Dr
OAKWOOD HILLS, IL 60013
Charge No: 440-2023-01671

EEOC Representative and email:     TIEREN DOKES
Federal Investigator
tieren.dokes@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 440-2023-01671.

On behalf of the Commission,

Digitally Signed By:Diane Smason
05/05/2023

Diane Smason
Acting District Director

**Cc: Liberty Mutual Insurance Company**

Minh Thach
Liberty Mutual Group
175 BERKELEY ST
Boston, MA 02116

Kevin Madden
Liberty Mutual Group, Inc.
175 BERKELEY ST
Boston, MA 02116


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 440-2023-01671 to the District Director at Julianne Bowman, 230 S Dearborn Street

Chicago, IL 60604.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.