**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SUMMER CAMPBELL, | Case No. 1:23-cv-05101 |
| Plaintiff, | Judge John F. Kness |
| v. | |
| LIBERTY MUTUAL INSURANCE, | |
| Defendant. | |

**DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO
PLAINTIFF'S COMPLAINT**

NOW COMES Defendant, LIBERTY MUTUAL GROUP INC. ("LM" or "Company")[1],

and pursuant to Federal Rules of Civil Procedure 8 and 12, for its Answer and Affirmative

Defenses to Plaintiff Summer Campbell's ("Campbell") Complaint, states as follows:

**INTRODUCTION**

**COMPLAINT ¶1:**

Campbell is a woman with a mental disability who was hired by LM on April 12, 2021,
as a technical assistant in payments. On or about January 31, 2022, Campbell became an
associate account analyst within LM after having applied for the position. Despite Campbell's
contributions and service to LM, the company engaged in unlawful discrimination and retaliation
based on her mental disabilities. LM's unlawful conduct directly led to Campbell's constructive
discharge on February 6, 2023.

**ANSWER:**

LM admits that it hired Campbell as a Technical Assistant I on April 12, 2021. LM

further admits that Campbell was promoted to an Associate Account Analyst on or about January

---

[1] Incorrectly referred to in the Complaint as Liberty Mutual Insurance. Liberty Mutual Group Inc. employed
Plaintiff and is the proper Defendant.

31, 2022 after having applied for the position, and that she alleges she has a mental disabilities.

LM denies the remaining allegations in Paragraph 1.

## JURISDICTION AND VENUE

**COMPLAINT ¶2:**

Campbell's claims arise under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1 *et seq.,* as amended by P.A. 98-1050 (Jan. 1, 2015). This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C § 1367.

**ANSWER:**

LM admits that Campbell intends to bring claims under the ADA and IHRA. LM further

admits that this Court has supplemental jurisdiction over her state law claims. LM denies the

remaining allegations in Paragraph 2.

**COMPLAINT ¶3:**

Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). LM operates in this District and maintains offices in this District, and the unlawful conduct alleged in this Complaint occurred in this District.

**ANSWER:**

LM admits that venue is proper in the Northern District of Illinois and that LM operates

and maintains offices in this District. LM denies the remaining allegations in Paragraph 3.

## PARTIES

**COMPLAINT ¶4:**

Plaintiff Campbell is an individual who resided in Oakwood Hills, IL during all relevant times. Campbell continues to reside in Oakwood Hills, IL.

**ANSWER:**

Upon information and belief, LM admits the allegations in Paragraph 4.

**COMPLAINT ¶5:**

Defendant LM is a private corporation that is the fifth largest global property and casualty insurer and ranks 86 on the Fortune 100 list of largest US corporations. LM's

headquarters are in Boston, Massachusetts, but they operate in each state, including Illinois, where the discrimination occurred.

**ANSWER:**

LM admits that it is a private corporation that ranks 86 on the Fortune 100 list of largest

US corporations. LM further admits it's headquartered in Boston, Massachusetts, and operates in

Illinois and other states. LM admits that it is the fifth largest global property and casualty insurer

based on gross written premium in 2022, but denies that it engaged in any discrimination, and

denies the remaining allegations in Paragraph 5.

**COMPLAINT ¶6:**

On LM's website, their "Commitment" page states, in part, "At Liberty Mutual, diversity is about all of us. We believe that recognizing, appreciating and applying the unique insights, perspectives and backgrounds of each person cultivates an atmosphere of trust and respect. It's also key to our success in engaging with all people and possibilities across differences. We work across all dimensions of diversity, including race, ethnicity, gender, LGBTQ+, military status, *people with disabilities*, and more... We also recognize that gender and race are not the only dimensions of diversity people identify with. We are all multidimensional, and we're committed to gaining a better understanding of all facets of diversity — such as veterans, LGBTQ+ and *those with disabilities.* That's why in 2021, we launched our self-ID program in the US, enabling employees to self-identify across several dimensions of diversity." (emphasis added).

**ANSWER:**

LM admits that the statements contained in Paragraph 6 reflect a portion of the

information contained on its "Our Commitment" page of the Company's website.

## FACTS

**COMPLAINT ¶7:**

Campbell is a young woman with several disabilities. In 2021, Campbell was diagnosed with Generalized Anxiety Disorder, Major Depressive Disorder Recurrent Moderate, Post-Traumatic Stress Disorder ("PTSD"), and Attention-Deficit Hyperactivity Disorder ("ADHD").

**ANSWER:**

LM admits that Campbell advised LM that she was diagnosed with Generalized Anxiety

Disorder, Major Depressive Disorder Recurrent Moderate, Post-Traumatic Stress Disorder, and

Attention-Deficit Hyperactivity Disorder. LM further l admits that Plaintiff identifies herself as a "young woman with several disabilities." LM denies the remaining allegations in Paragraph 7.

**COMPLAINT ¶8:**

Campbell is currently pursuing a diagnosis for Autism, a process that can take over a year. Campbell has passed the Autism screening portion and scored "consistent with Autism," and has received a referral for a formal assessment.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to the allegations in

Paragraph 8.

**COMPLAINT ¶9:**

Campbell began receiving treatment for anxiety, depression, and PTSD in April 2021, and treatment for ADHD in October 2021.

**ANSWER:**

Upon information and belief, LM admits that Campbell advised LM that she was

receiving treatment in 2021. LM lacks knowledge or information sufficient to form a belief as to

the remaining allegations in Paragraph 9.

**COMPLAINT ¶10:**

LM hired Campbell as a Technical Assistant in April 2021.

**ANSWER:**

LM admits Campbell was hired as a Technical Assistant I in April 2021.

**COMPLAINT ¶11:**

In early February 2022, shortly after Campbell started her new position at LM, she set up a phone call with her supervisor, Colleen Busby ("Busby"), to disclose her disabilities and inform Busby that she would be needing accommodations.

**ANSWER:**

LM admits that on or around early 2022, Campbell discussed her purported disabilities

with her supervisor, Busby. LM denies the remaining allegations in Paragraph 11.

**COMPLAINT ¶12:**

Busby quickly overtook the conversation and began asking Campbell intrusive questions about her disabilities, making Campbell extremely uncomfortable.

**ANSWER:**

LM admits Busby asked Campbell questions during their conversation, but lacks

knowledge or information sufficient to form a belief as to whether Campbell was uncomfortable.

LM denies the remaining allegations in Paragraph 12.

**COMPLAINT ¶13:**

Busby informed Campbell that she originally intended to assign Campbell her own book of accounts, but now that she knew about Campbell's disabilities, her plans would have to change, and Campbell would instead have to be a "floater" on the team.

**ANSWER:**

LM admits that Busby told Campbell she would be a "floater" on the team. LM denies

the remaining allegations in Paragraph 13.

**COMPLAINT ¶14:**

Busby was not aware of the details or possible limitations of Campbell's disabilities; yet she assumed Campbell would not be capable of managing her own accounts, which is why Busby decided it would be best for Campbell to instead be a "floater."

**ANSWER:**

LM denies the allegations in Paragraph 14.

**COMPLAINT ¶15:**

This position carried less responsibility, was unpredictable, and due to the nature of being a "floater," it would be difficult for Campbell to receive recognition for her work.

**ANSWER:**

LM denies the allegations in Paragraph 15.

**COMPLAINT ¶16:**

Even though Busby originally planned to give Campbell her own accounts, she ultimately never assigned any to Campbell because she assumed Campbell's disability would preclude her from handling her accounts autonomously and competently.

**ANSWER:**

LM denies the allegations in Paragraph 16.

**COMPLAINT ¶17:**

Busby's comments were incredibly disconcerting because they were overtly discriminatory and retaliatory. Busby's false assumption and decision to not give Campbell her own accounts were retaliatory actions based on Campbell's disability. These actions stunted her professional growth and took away an opportunity for Campbell to work more autonomously and have more responsibilities.

**ANSWER:**

LM denies the allegations in Paragraph 17.

**COMPLAINT ¶18:**

During this same conversation, Busby also expressed concerns about what other people might think or say about Campbell's disabilities, and asked Campbell how she planned to stop others from finding out about her disabilities.

**ANSWER:**

LM denies the allegations in Paragraph 18.

**COMPLAINT ¶19:**

These comments were incredibly inappropriate and discriminatory, as they suggested Campbell's disabilities were inherently shameful or embarrassing and warranted a plan of action to prevent others from learning about them.

**ANSWER:**

LM denies the allegations in Paragraph 19.

**COMPLAINT ¶20:**

These comments revealed Busby's biases against people with disabilities. Busby believed Campbell would be treated differently by her colleagues when they learned of her disability, the same way Busby had treated Campbell differently after she learned about her disabilities.

**ANSWER:**

LM denies the allegations in Paragraph 20.

**COMPLAINT ¶21:**

Busby also asked Campbell something to the effect of, "can you get over it in a few months?" "It" being her disabilities. This question was very offensive to Campbell; and it trivialized her serious, life-long disabilities.

**ANSWER:**

LM denies the allegations in Paragraph 21.

**COMPLAINT ¶22:**

When Campbell brought up her need for accommodations to Busby, Busby stated that formal accommodation requests would not be necessary, and that she could address Campbell's concerns "informally."

**ANSWER:**

LM denies the allegations in Paragraph 22.

**COMPLAINT ¶23:**

Throughout February and March of 2022, Campbell had daily training sessions with Senior Account Analyst Kat Stoner ("Stoner") to learn about pre-sale work on accounts, and overall training on how to approach daily tasks.

**ANSWER:**

LM admits that Campbell had meetings with Stoner as part of her training that included but was not limited to training on such topics as pre-sale work. LM denies the remaining allegations in Paragraph 23.

**COMPLAINT ¶24:**

LM typically assigns one mentor for every new hire. However, Campbell was given two mentors—Stoner and Account Specialist Anneke Higgins ("Higgins").

**ANSWER:**

LM admits that Campbell was given two mentors – Stoner and Higgins. LM denies the remaining allegations in Paragraph 24.

**COMPLAINT ¶25:**

Stoner would schedule sessions for one to two hours at a time but would often go over the allotted time by an additional one to two hours.  Stoner did this without asking Campbell if she was comfortable going over the allotted time and required Campbell to work through her lunch break at times.

**ANSWER:**

LM admits that Stoner conducted training sessions with Campbell that might last one to

two hours. LM denies the remaining allegations in Paragraph 25.

**COMPLAINT ¶26:**

During this period, Busby would often cancel her weekly one-on-one meetings with Campbell and failed to reschedule them.

**ANSWER:**

LM admits that Busby cancelled some one-on-one meetings with Campbell in July 2022

due to vacation and illness. LM denies the remaining allegations in Paragraph 26.

**COMPLAINT ¶27:**

When Campbell was eventually able to meet with Busby, she informed Busby of the difficulties she was experiencing with Stoner and the way her mentors were training her.

**ANSWER:**

LM admits that Campbell shared difficulties she was having with training during a

meeting with Busby. LM denies the remaining allegations in Paragraph 27.

**COMPLAINT ¶28:**

Campbell shared how having to jump between multiple different trainers on multiple topics in one day was difficult for her due to her ADHD.

**ANSWER:**

LM admits that Campbell expressed concern about her training.  LM denies the

remaining allegations in Paragraph 28.

**COMPLAINT ¶29:**

On March 29, 2022, Campbell met with Busby to finally address the difficulties she was having with her mentor's training structure and overall behavior.

**ANSWER:**

LM admits that Busby and Campbell communicated with each other on March 29, 2022,

but denies the remaining allegations in Paragraph 29.

**COMPLAINT ¶30:**

Campbell also disclosed her status as neurodivergent[2] to her two mentors in an email. In this email, she detailed the specific issues she struggles with when learning.

**ANSWER:**

LM admits that Campbell emailed her mentors stating she was neurodivergent and

provided a template she created which she reported would assist her in learning tasks. LM denies

the remaining allegations in Paragraph 30.

**COMPLAINT ¶31:**

Campbell also took the initiative to generate a document that would help her mentors learn how to present information to Campbell in a way that was accessible to her and how her brain works.

**ANSWER:**

LM admits Campbell provided a template on her learning style to her mentors via email.

LM denies the remaining allegations in Paragraph 31.

**COMPLAINT ¶32:**

Campbell asked that this template be used as part of her accommodations. Busby and Higgins acknowledged Campbell's email and complimented her for being vocal about her needs.

---

[2] The term "neurodivergent" describes people whose brain differences affect how their brain works. That means they have different strengths and challenges from people whose brains don't have those differences. The possible differences include medical disorders, learning disabilities and other conditions. The possible strengths include better memory, being able to mentally picture three-dimensional (3D) objects easily, the ability to solve complex mathematical calculations in their head, and more.

**ANSWER:**

LM admits that Campbell provided the template to her mentors and stated that the template would make it "easier on [her]." LM further admits Busby and Higgins acknowledged the email and thanked her for providing it. LM denies the remaining allegations in Paragraph 32.

**COMPLAINT ¶33:**

Busby even praised Campbell's template and sent it out to supervisors on other teams, proposing it be implemented for all new hires in the future.

**ANSWER:**

LM admits that Busby stated she "applauded" Campbell for being a voice for herself and her learning style. LM further admits that Busby shared Campbell's template with supervisors on other teams. LM denies the remaining allegations in Paragraph 33.

**COMPLAINT ¶34:**

However, Busby never once confirmed that Campbell's simple accommodation request would be granted.

**ANSWER:**

Paragraph 34 contains a legal conclusion to which no response is required. To the extent a response is required, LM denies the allegations in Paragraph 34.

**COMPLAINT ¶35:**

Higgins complied with this request halfway, but Stoner never acknowledged the email and never complied with Campbell's accommodation request.

**ANSWER:**

LM denies the allegations in Paragraph 35.

**COMPLAINT ¶36:**

On April 21, 2022, Campbell submitted a formal request for ADA accommodations to LM's Human Resources ("HR") department after her accommodation requests went largely unaddressed.

**ANSWER:**

LM admits that Campbell contacted the HR department in April 2022 requesting

workplace accommodations. LM denies the remaining allegations in Paragraph 36.

**COMPLAINT ¶37:**

Campbell also informed HR that Busby continued to make ableist comments to her. Some of these ableist comments were something to the effect of "you're too emotionally connected to your work. It's not a big deal, don't stress about it so much"; "you have to accept the training you are given. You can't expect people to adjust to you"; "everyone is a little ADHD"; "I'm on medication too, everyone struggles"; "your mentors wouldn't bully you, I know them. It's in your head"; "do you think you will feel better and be able to do your job after a bit of time? Or do you think you will always have anxiety?"; "I'm accepting of you, but I worry what other people will think if they find out about your disabilities" and "how are we going to keep others from finding out about your disabilities?"

**ANSWER:**

LM admits that Campbell informed HR that Busby made ableist comments to her. LM

denies the remaining allegations in Paragraph 37.

**COMPLAINT ¶38:**

HR informed Campbell they would follow up with her in three to five business days. Campbell followed up with HR on April 28 and April 29, 2022, asking when she could expect an update. HR failed to respond.

**ANSWER:**

LM denies the allegations in Paragraph 38.

**COMPLAINT ¶39:**

On May 11, 2022, Case Associate III, Christine Ferretti ("Ferretti"), requested a meeting with Campbell to discuss her accommodations. Ferretti worked in the leave case management team within the Talent and Enterprise Services division of LM. This meeting was meant to be informative, whereby Ferretti would explain the accommodation process, collect information about Campbell's needs, and fill her in on next steps. Campbell was under the impression that she would work with Ferretti to discuss accommodation options, but Ferretti had no suggestions beyond a standing desk and ergonomic keyboard. HR refused to order Campbell's standing desk until she returned from short term disability leave ("STD"). However, by the time she returned, the standing desk was on backorder, and Campbell never received it at any point during her employment with LM.

**ANSWER:**

LM admits that Ferretti and Campbell had a meeting on May 11, 2022, to discuss

Campbell's accommodation requests. LM further admits that a standing desk and ergonomic

keyboard were among the accommodations it offered. LM denies the remaining allegations in

Paragraph 39.

**COMPLAINT ¶40:**

During the meeting between Ferretti and Campbell, Campbell vocalized the difficulties
she was having with her training process and with her manager, Busby.

**ANSWER:**

LM admits only that Ferretti and Campbell met. LM denies the remaining allegations in

Paragraph 40.

**COMPLAINT ¶41:**

Campbell explained how Busby continued to make comments and ask questions that
offended Campbell and made her very uncomfortable. Some of these questions included
something to the effect of "what medications are you on?; "how did you go about getting
diagnosed, and what was your experience like?; and "do you have advice for my child?"

**ANSWER:**

LM admits only that Ferretti and Campbell met. LM denies the remaining allegations in

Paragraph 41.

**COMPLAINT ¶42:**

Busby asked whether Campbell had any advice for her child because, during the first few
months of Campbell joining the team, Busby was starting to learn that her child might be autistic.
While Busby began the diagnosis process for her son around May 2022, she would ask Campbell
questions nearly every single time they had a private conversation, conversations that were
meant to discuss Campbell's career growth, not Busby's personal life.

**ANSWER:**

LM admits that Busby and Campbell discussed her son during the relevant time period.

LM denies the remaining allegations in Paragraph 42.

**COMPLAINT ¶43:**

When Campbell shared some of her everyday sensory struggles with Busby, which included tasks like taking a shower, feeding herself, remembering to go to the bathroom, and remembering to drink water, Busby expressed complete shock by saying comments to the effect of "I would never expect that from you!"; "you seem so put together, do you really struggle to even shower?"

**ANSWER:**

LM admits that Campbell shared some of her "sensory struggles" with Busby.   LM

denies the remaining allegations in Paragraph 43.

**COMPLAINT ¶44:**

In response to all that Campbell shared with Ferretti, Ferretti said they would work together to address Campbell's accommodation options and would look into connecting Campbell with the correct HR department to address Busby's discriminatory comments.  Ferretti also asked Campbell to sign medical release paperwork so that her doctors could share confidential information with HR about Campbell's diagnoses and treatment history.

**ANSWER:**

LM admits Ferretti indicated they would work together to address her accommodation

options, and that she asked Campbell to sign medical release paperwork. LM denies the

remaining allegations contained in Paragraph 44.

**COMPLAINT ¶45:**

The following day, Busby met with Campbell for their second quarter check-in.  Busby informed Campbell that she was performing well, and that Busby did not have any performance concerns about her.  However, Busby again failed to discuss the ongoing and unaddressed challenges that Campbell was experiencing.

**ANSWER:**

LM admits that Busby met with Campbell for their second quarter check-in on May 12,

2022 and that Busby advised Campbell she was performing well.  LM denies the remaining

allegations in Paragraph 45.

**COMPLAINT ¶46:**

By June 23, 2022, over a month since Campbell first met with case associate Ferretti, Campbell's accommodation requests were still not fulfilled.

**ANSWER:**

LM denies the allegations in Paragraph 46.

**COMPLAINT ¶47:**

Campbell emailed Talent Operations Supervisor Caitlyn Heald ("Heald"), explaining the situation, and asking to be assigned to a new case associate, specifically one that had more experience in addressing disability accommodations for neurodivergent people. However, Heald refused to connect Campbell to a new case associate.

**ANSWER:**

LM admits that Campbell emailed Talent Operations Supervisor Heald asking to be

assigned to a new case associate who had "more experience in mental

disabilities/neurodivergence." LM further admits that Heald asked that Campbell continue to

work with Ferretti. LM denies the remaining allegations in Paragraph 47.

**COMPLAINT ¶48:**

Busby herself had acknowledged to Campbell that there were many unexplained delays in the accommodation process, and Campbell's own doctors also stated that the accommodation process was not being conducted correctly.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to what Campbell's

doctors stated to her. LM denies the remaining allegations in Paragraph 48.

**COMPLAINT ¶49:**

Because Heald refused to connect Campbell to another case associate, Campbell was forced to go above Heald and contact the Manager of Talent Operations Michelle Warstler ("Warstler") to explain the situation and why Campbell needed her help.

14

**ANSWER:**

LM admits that Campbell contacted Manager of Talent Operations Michelle Warstler.

LM denies the remaining allegations in Paragraph 49.

**COMPLAINT ¶50:**

On June 29, 2022, Warstler met with Campbell and acknowledged that Ferretti was not doing her job correctly, and that Campbell would be assigned to a new case manager, one who would ensure the process moved quickly, especially considering it had been two months since Campbell first made her official requests.

**ANSWER:**

LM admits that Warstler met with Campbell on June 29, 2022, and ultimately assigned

her a new case manager. LM denies the remaining allegations in Paragraph 50.

**COMPLAINT ¶51:**

Campbell also informed Warstler about having told Ferretti about the offensive comments and questions from Busby, which was the second time she notified someone from HR about Busby's discriminatory actions.

**ANSWER:**

LM denies the allegations in Paragraph 51.

**COMPLAINT ¶52:**

While this entire process was taking place, Campbell consistently voiced her concerns about the inadequate training she had been receiving, being given incorrect information from her own mentors, having important questions go unanswered, feeling intentionally excluded by her mentors, and being verbally berated by another team's Manager over the phone.

**ANSWER:**

LM admits that Campbell voiced her concerns. LM denies Campbell's characterization of

her concerns and denies all remaining allegations in Paragraph 52.

**COMPLAINT ¶53:**

These significant issues, coupled with Campbell's disabilities, made her very unwell and caused her to experience several mental health crises.  Her progress in therapy continued to regress, and her therapists suggested she quit to protect her mental health from the unaccommodating environment.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to the allegations

regarding Campbell's mental health crises, her therapy progress, and her therapists' suggestion.

LM denies all the remaining allegations in Paragraph 53.

**COMPLAINT ¶54:**

On June 30, 2022, Warstler introduced Campbell to Complex Case Associate Jennifer
Russ ("Russ"), who would be taking over Campbell's case.

**ANSWER:**

LM admits the allegations in Paragraph 54.

**COMPLAINT ¶55:**

Campbell met with Russ a few days later and walked Russ through everything that had
happened to her to date, including Busby's offensive comments. In response, Russ stated she
would look into connecting Campbell to the correct HR department to address her concerns and
would work with Campbell on an expanded list of accommodations.

**ANSWER:**

LM admits that Russ and Campbell communicated regarding her requested workplace

accommodation requests, and that Russ advised Campbell that she would refer her to an HR

department that reviews employee concerns, which was a different department from Russ's. LM

denies the remaining allegations in Paragraph 55.

**COMPLAINT ¶56:**

Around this time, Campbell asked Warstler if there were HR personnel who were better
trained on working with neurodivergent disabilities. Warstler responded that there were no
specialized individuals or teams of the sort.

**ANSWER:**

LM denies the allegations in Paragraph 56.

**COMPLAINT ¶57:**

Given that Busby was not properly managing Higgins or Stoner's refusals to implement
Campbell's accommodations, Campbell felt she had no other choice but to disclose her

diagnoses to her mentors. She hoped this would finally make them understand why these accommodations were so critical to her mental health.

**ANSWER:**

LM admits that Campbell told Stoner and Higgins that she was neurodivergent on or around July 25, 2022. LM lacks knowledge or information sufficient to form a belief as Campbell's feelings. LM denies the remaining allegations in Paragraph 57.

**COMPLAINT ¶58:**

Unfortunately, this only backfired, and the two mentors also made offensive and ableist comments to Campbell. They said something to the effect of, "you are so emotional over this stuff, you have to let it go," "everyone has a little ADHD," "you have to not care so much," "you haven't even made any mistakes yet, stop worrying." They even went so far as to ask if Campbell thought she would ever be able to overcome her disabilities and do the job, the same ableist and offensive question that Busby had also previously asked.

**ANSWER:**

LM denies the allegations in Paragraph 58.

**COMPLAINT ¶59:**

On July 29, 2022, over three months since Campbell first requested her accommodations to HR, she finally had to inform the company that she would be stepping away on FMLA leave due to the unmet support needs and the impact they had on her mental health over the last six months. Campbell specifically voiced her hope that she would be able to return from FMLA leave to a safe and accommodating environment in a few weeks.

**ANSWER:**

LM admits that on July 29, 2022, Campbell informed LM she would be taking FMLA leave, and that Campbell stated: "I hope that this time away will allow me to heal from the difficulties of these past 6 months and that, upon my return, we can reevaluate the support that you and Liberty can provide me." LM lacks knowledge or information sufficient to form a belief as to Campbell's mental health. LM denies the remaining allegations in Paragraph 59.

**COMPLAINT ¶60:**

Just 17 minutes after Campbell informed her manager about her decision to take leave, Russ was somehow able to expedite the approval of three accommodation requests from

Campbell's list of four requests. What HR could not accomplish in three months was somehow accomplished within less than twenty minutes after Campbell informed the company that she would be taking FMLA leave.

**ANSWER:**

LM admits that it communicated approved accommodation requests to Campbell on

July 29, 2022. LM denies the remaining allegations in Paragraph 60.

**COMPLAINT ¶61:**

The months leading up to Campbell's FMLA leave were detrimental to her mental and physical health. She had regular meltdowns, a symptom of her disabilities, was unable to eat or care for herself, and was encouraged by her therapist to quit her job at LM because of their failure to meet her reasonable accommodation requests.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to Campbell's mental

and physical health and her therapist's advice. LM denies the remaining allegations in Paragraph

61.

**COMPLAINT ¶62:**

Campbell was on FMLA leave from July 29, 2022, to January 25, 2023.

**ANSWER:**

LM admits the allegations in Paragraph 62.

**COMPLAINT ¶63:**

While on FMLA leave, Campbell worked with her therapist to create a second list of requested accommodations ("V2 accommodations"). This list was meant to address the necessary changes to Campbell's training that were previously not enforced by Busby, as well as to protect Campbell from Busby's inappropriate behavior. Campbell and her doctors informed Russ that it was imperative that Campbell return to work with accommodations in place to support her.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to what Campbell

discussed with her therapist while she was out on FMLA leave. LM admits that it received

communications from Campbell and her doctor regarding requested accommodations while she was on FMLA leave. LM denies all remaining allegations in Paragraph 63.

## COMPLAINT ¶64:

On September 19, 2022, Campbell reached out to Russ for an update on her review of the V2 accommodations and informed her that she would be returning to work in a few weeks. Campbell wanted to ensure that she would be returning to a safe work environment. Russ stated that the accommodations were still being reviewed and that she would like to schedule a call with Campbell to discuss the information Campbell's doctor put in the paperwork.

## ANSWER:

LM admits that Campbell contacted Russ on September 19, 2022, for an update on her V2 accommodations and to discuss her return to work. LM further admits that Russ requested to speak by phone with Campbell to discuss further. LM denies the remaining allegations in Paragraph 64.

## COMPLAINT ¶65:

During a phone call between Campbell and Russ on September 22, 2022, Russ demonstrated her clear misunderstanding of the nature of Campbell's needs, and why her specific accommodations were so necessary. Russ informed Campbell that Campbell should request these accommodations from a different HR department, claiming that Campbell's requests were not actual accommodations. Russ further suggested Campbell speak directly to Busby and ask for the changes to her training, claiming it was something that the two should be able to work out. Russ framed these issues as interpersonal problems, rather than difficulties that worsened Campbell's disabilities.

## ANSWER:

LM admits that Campbell and Russ had a conversation on September 22, 2022, regarding her requested accommodations. LM denies the remaining allegations in Paragraph 65.

## COMPLAINT ¶66:

Russ insisted that she had never heard anyone request similar accommodations, and that Campbell should just take those concerns up with her manager.

## ANSWER:

LM denies the allegations in Paragraph 66.

**COMPLAINT ¶67:**

Campbell pushed back on this by telling Russ that every accommodation she had requested came from the United States Department of Labor's Job Accommodation Network ("JAN") website and were specific to her disabilities. Campbell also reminded Russ that the nature of her disabilities made conversations about these issues extremely difficult, and further pointed out that she had asked Busby, her manager, to make changes to Campbell's training structure, but Busby never implemented them.

**ANSWER:**

LM denies the allegations in Paragraph 67.

**COMPLAINT ¶68:**

Campbell also took that moment to point out a second time to Russ that she was experiencing discrimination from Busby, and that Russ had previously promised to find Campbell someone to help, but never followed up.

**ANSWER:**

LM admits that Campbell stated she was experiencing discrimination from Busby. LM

denies the remaining allegations in Paragraph 68.

**COMPLAINT ¶69:**

This was the fourth time Campbell had brought up Busby's discriminatory behavior to HR. It was at that point that Russ suggested that Campbell take her accommodation requests to an HR department that was more relationship-centered.

**ANSWER:**

LM admits that Russ referred Campbell's concerns to HR. LM denies the remaining

allegations in Paragraph 69.

**COMPLAINT ¶70:**

Campbell had generated a document to show Russ that every requested accommodation she had been sending to a "relationship centered" HR person was a reasonable accommodation. Campbell specifically requested that Russ continue to review *all* the accommodation requests Campbell's doctor had provided, to which Russ agreed.

**ANSWER:**

To the extent Campbell suggests that her requested accommodations were all "reasonable accommodations," that assumes a legal conclusion to which no answer is required. LM otherwise lacks knowledge or information sufficient to form a belief as to "generated a document" or the "specific requests" made by Campbell. LM denies the remaining allegations in Paragraph 70.

**COMPLAINT ¶71:**

Throughout the arduous process of Campbell attempting to access accommodations, she believed HR was acting in good faith to help her. HR repeatedly told Campbell they were working to educate themselves regarding her disabilities.

**ANSWER:**

LM admits that the HR Department that handled workplace accommodations told Campbell they were working with her to accommodate her disabilities. LM lacks knowledge or information sufficient to form a belief as to Campbell's "beliefs." LM denies the remaining allegations in Paragraph 71.

**COMPLAINT ¶72:**

However, HR consistently failed on following through. Russ in particular essentially refused to investigate Campbell's reasonable accommodation requests by claiming the other HR department would fix the problem. This caused Campbell to feel unsafe with HR and their intentions. Campbell also experienced a great deal of paranoia, a symptom of her disabilities that is triggered when people's words do not align with their actions.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to Campbell's feelings and emotions. LM denies the remaining allegations in Paragraph 72.

**COMPLAINT ¶73:**

On September 27, 2022, Campbell was passed over to Associate Talent Operations Specialist Stephanie Falconer ("Falconer"). Campbell had to speak with Falconer and her associate, Heather Cote ("Cote") to discuss all of Campbell's concerns and unaddressed needs. The two informed Campbell they would be conducting an "investigation" into the issues.

**ANSWER:**

LM admits that Falconer and Cote conducted an investigation into Campbell's concerns

beginning on or around September 27, 2022. LM denies the remaining allegations in Paragraph

73.

**COMPLAINT ¶74:**

On November 4, 2022, Campbell had a second meeting with Falconer and Cote to review their findings and offer "resolutions." Again, this conversation demonstrated HR personnel's significant lack of understanding regarding the nature of Campbell's disabilities and accommodation needs.

**ANSWER:**

LM admits that Campbell had a meeting with Falconer and Cote to review their

investigation findings. LM denies the remaining allegations in Paragraph 74.

**COMPLAINT ¶75:**

Falconer asked Campbell to "speak up for herself," give others the opportunity to improve their behavior, and share when she is uncomfortable in the moment—the very actions that someone with Campbell's disabilities has great difficulty doing. Once again, Campbell was forced to push back on Falconer's proposed resolutions and asked for HR to continue its investigation.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to Campbell's

emotional state or whether she would have difficulty speaking up for herself. LM admits

Campbell asked HR to continue its investigation. LM denies the remaining allegations in

Paragraph 75.

**COMPLAINT ¶76:**

Falconer agreed with Campbell that her concerns had still not been resolved and assured her she would continue working towards addressing the issues so that Campbell would feel safe upon her return to work.

**ANSWER:**

LM admits that Falconer told Campbell that she would follow up with her team regarding feedback before her return to work. LM denies the remaining allegations in Paragraph 76.

**COMPLAINT ¶77:**

That same day, Campbell informed Russ that she had reached out to the legal aid organization for people with disabilities—Equip for Equality—and that their lawyer believed there was an unreasonable delay in providing Campbell with her accommodations.

**ANSWER:**

LM admits that Campbell informed Russ that she contacted Equip for Equality and stated that they "share [her] concern that there seems to be an unreasonable delay in providing accommodations." LM denies that there was an unreasonable delay and denies the remaining allegations in Paragraph 77.

**COMPLAINT ¶78:**

Just a few minutes after Campbell disclosed this, Russ sent her a new set of approved accommodations from her V2 requested list. However, there were accommodation requests remaining that had neither been accepted nor denied. This was the second time HR expedited making approvals. The first time, it was after Campbell disclosed that she was going to utilize FMLA. This time, it was due to Campbell disclosing she had reached out to legal counsel. This demonstrates how easily HR could have granted Campbell's reasonable accommodations, but instead deliberately chose not to until Campbell informed LM that she had sought legal advice.

**ANSWER:**

LM admits that Russ emailed her approved accommodations from her V2 requested list on November 4, 2022. LM denies the remaining allegations in Paragraph 78.

**COMPLAINT ¶79:**

On or about November 11, 2022, Campbell emailed Warstler to escalate her concerns about the accommodation process. Campbell requested the accommodation of nonverbal communication for their conversation. Warstler denied this request under the excuse that the general accommodation process is not one that is conducted in writing.

**ANSWER:**

LM admits that Campbell emailed Warstler on November 11, 2022 to discuss the

accommodation process, and that she requested their conversation occur in writing. LM denies

the remaining allegations in Paragraph 79.

**COMPLAINT ¶80:**

Campbell was forced to verbally discuss her concerns with Warstler, even after having told her that verbal calls with HR continuously place her in a state of fear, stress, anxiety, and PTSD flashbacks that put her at a disadvantage when advocating for herself.

**ANSWER:**

LM admits that she verbally discussed her concerns with Warstler. LM denies the

remaining allegations in Paragraph 80.

**COMPLAINT ¶81:**

On or about November 16, 2022, Campbell emailed the CEO of Liberty Mutual, David Long ("Long"). She informed him of her experience up to that point, requested assistance in receiving accommodations, and alerted him to her concerns about the accommodation process not being accessible or adequate for people with neurodivergent disabilities.

**ANSWER:**

LM admits Campbell emailed the CEO of Liberty Mutual, Long, on November 16, 2022

regarding her concerns. LM denies the remaining allegations in Paragraph 81.

**COMPLAINT ¶82:**

Long replied, stating that the accommodation of neurodivergent workers relied heavily on the support of individual managers. He escalated her concerns to the top of Chief People Officer ("CPO"), Jen Ughetta ("Ughetta") agenda, and Ughetta later replied simply telling Campbell to keep waiting for her current HR contacts to assist her.

**ANSWER:**

LM admits that Long replied to Campbell referring her concerns to CPO Ughetta, and

further admits that Ughetta replied to Campbell. LM denies the remaining allegations in

Paragraph 82.

**COMPLAINT ¶83:**

On or about November 28, 2022, Campbell emailed Falconer with a summary of their November 4, 2022, conversation and laid out the next steps the two had agreed upon. Falconer replied a week later stating she had shared Campbell's concerns with Busby, closed Campbell's case, and that Campbell should verbally discuss any further issues with Busby.

**ANSWER:**

LM admits that Campbell emailed Falconer on November 28, 2022 regarding their

November 4, 2022 conversation. LM further admits that Falconer replied on December 6, 2022

encouraging Campbell to speak with her manager and providing Tran as her first point of contact

for 1x1s. LM further admits that Falconer stated she was closing out her review. LM denies the

remaining allegations in Paragraph 83.

**COMPLAINT ¶84:**

Campbell replied to Falconer, asking for an explanation as to why her case was closed, how her concerns were resolved, and how she was supposed to feel safe returning to work.

**ANSWER:**

LM admits Campbell emailed Falconer regarding her case closure. LM denies the

remaining allegations in Paragraph 84.

**COMPLAINT ¶85:**

Falconer repeatedly refused to answer these questions or re-open Campbell's case, even though Campbell continued to push the subject through January 19, 2023.

**ANSWER:**

LM admits that Campbell advised that she wanted to continue the conversation in

January 2023. LM denies all remaining allegations in Paragraph 85.

**COMPLAINT ¶86:**

On or about December 1, 2022, Campbell asked Warstler for a copy of her job descriptions and essential functions ahead of their verbal call. Warstler failed to provide Campbell with this information until just 14 hours ahead of their 9 am call.

**ANSWER:**

LM admits that Campbell asked Warstler for a copy of her job description and essential

functions in advance of their call. LM further admits that Warstler provided the requested

information to Campbell ahead of their call. LM denies the remaining allegations in Paragraph

86.

**COMPLAINT ¶87:**

Additionally, the information Warstler provided included essential functions that
Campbell had never seen before, as they were never provided to Campbell's doctor in previous
paperwork.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to what Campbell had

or had not seen before. LM admits that Campbell's doctor was provided job functions, and

denies the remaining allegations in Paragraph 87.

**COMPLAINT ¶88:**

Before she was scheduled to speak with Warstler, Campbell asked Warstler to explain
where these essential functions came from, but Warstler never answered this question. It
appeared to Campbell that Warstler was attempting to slip in essential functions that would clash
with her disabilities and make it look like Campbell could not perform her job's essential
functions.

**ANSWER:**

LM admits that Campbell asked Warstler to "provide [Campbell] with evidence that these

functions were identified as essential prior to [her] acceptance of [her] role" before her meeting

with Warstler that same day. LM denies the remaining allegations in Paragraph 88.

**COMPLAINT ¶89:**

Campbell stated that she would not discuss the new essential functions until Warstler
proved they were documented as essential prior to Campbell applying for the role. Warstler did
not provide the requested evidence and stopped bringing up these false essential job functions.

**ANSWER:**

LM admits that Campbell stated she would not discuss the essential functions until

Warstler provided evidence that they were essential functions prior to her acceptance of the role.

LM denies the remaining allegations in Paragraph 89.

**COMPLAINT ¶90:**

Campbell later had her call with Warstler. On this call, Warstler asked extremely pointed questions about Campbell's accommodation requests. Campbell then reiterated her concerns about Busby's behavior towards her, and Russ' failure to help until Campbell brought up her concerns multiple times.

**ANSWER:**

LM admits that Campbell had a call with Warstler where she asked questions of

Campbell about her accommodation requests, and where Campbell expressed her concerns about

Busby and Russ. LM denies the remaining allegations in Paragraph 90.

**COMPLAINT ¶91:**

Additionally, Campbell explained to Warstler that Russ was clearly not educated on neurodivergent accommodations, given that she continuously denied Campbell's very reasonable requests and told her she should be able to talk to Busby directly about her "preferences."

**ANSWER:**

LM admits that Campbell discussed her concerns about Busby and Russ during this

conversation. LM denies the remaining allegations in Paragraph 91.

**COMPLAINT ¶92:**

After this call, Campbell sent Warstler an email summarizing their agreed-upon action items and provided written answers to all of Warstler's questions to protect herself. Campbell even offered to work alongside the company to expand their support for neurodivergent people in general.

**ANSWER:**

LM admits that Campbell sent Warstler an email summarizing her interpretation of the

December 2, 2022 conversation. LM denies the remaining allegations in Paragraph 92.

**COMPLAINT ¶93:**

On or about December 13, 2022, Warstler connected Campbell to Employee Relations Consultant II Molly Izard-Gibb ("Izard-Gibb") to address Campbell's ongoing concerns about Busby's discriminatory actions. Izard-Gibb was part of LM's Global Employee Relations & HR Policy department.

**ANSWER:**

LM admits that Izard-Gibb, a member of the Global Employee Relations and HR

department, was engaged to review Campbell's concerns on or about December 13, 2022. LM

denies the remaining allegations in Paragraph 93.

**COMPLAINT ¶94:**

Campbell asked Warstler how Izard-Gibb was different from Falconer and asked why Campbell needed to retell her traumatic story to a fourth HR representative. Warstler never replied to this question.

**ANSWER:**

LM denies the allegations in Paragraph 94.

**COMPLAINT ¶95:**

This same day, Izard-Gibb reached out to Campbell to set up a verbal call. Campbell told her she would be prepared to discuss the discrimination from her manager, but that her concerns about the company-wide neurodivergent discrimination would need to be saved for another time, as it would take more than their scheduled hour to discuss both issues.

**ANSWER:**

LM admits that Izard-Gibb contacted Campbell the same day to set up a verbal call, and

that Campbell sent Izard-Gibb an agenda of topics for discussion prior to the call that included

discrimination and concerns about LM's "improper education of HR and Leadership in working

with, and accommodating, neurodivergent employees." LM denies the remaining allegations in

Paragraph 95.

**COMPLAINT ¶96:**

On or about December 15, 2022, Campbell and Izard-Gibb had a call to discuss Campbell's examples of discrimination. At the end of the call, Campbell asked her to schedule

another meeting to discuss her concerns about the company-wide discrimination. Izard-Gibb promised to have this discussion, but she avoided scheduling this second conversation.

**ANSWER:**

LM admits that Campbell and Izard-Gibb had a call to discuss Campbell's concerns of discrimination on December 15, 2022. LM further admits that Izard-Gibb stated she would follow up with Campbell following her investigation. LM denies the remaining allegations in Paragraph 96.

**COMPLAINT ¶97:**

On or about January 9, 2023, Campbell asked Izard-Gibb for an update on her case, but Izard-Gibb refused to provide any information. Campbell informed her that she wanted information about the status of her case because she feared her upcoming return to work while having an open discrimination case against her manager. Moreover, Campbell wanted more information because the nature of her disabilities makes the unknown very triggering for her. Izard-Gibb repeatedly refused to offer any information, timeline, or comfort on the subject, thereby further worsening the symptoms of Campbell's disabilities.

**ANSWER:**

LM admits that on January 9, 2023, Campbell emailed Izard-Gibb requesting an update on her case. LM denies the remaining allegations in Paragraph 97.

**COMPLAINT ¶98:**

On or about December 15, 2022, Warstler emailed Campbell the conclusion of her review. Warstler placed restrictions on the approved accommodations Campbell had previously received from Falconer and Russ. Warstler offered ineffective resolutions for previously unaddressed requests, and she even left some requests completely unaddressed.

**ANSWER:**

LM admits that on or about December 15, 2022 Warstler emailed Campbell the conclusion of her review, which included an analysis of Campbell's requested and provided accommodations. LM denies the remaining allegations in Paragraph 98.

**COMPLAINT ¶99:**

On or about December 27, 2022, Campbell replied to Warstler's review by explaining how her offered accommodations were ineffective and did not comply with the ADA. Campbell

29

also pointed out the accommodation requests that continued to go unaddressed. Warstler did not reply to this email and never addressed the document Campbell had made to explain how Warstler's offered accommodations were ineffective.

**ANSWER:**

LM admits that Campbell replied to Warstler's review noting that she felt the accommodations provided were not effective and in violation of the ADA, and that she would be filing a Charge of Discrimination with the EEOC. LM denies that Warstler failed to respond to the email or document regarding her accommodation requests. LM denies all remaining allegations in Paragraph 99.

**COMPLAINT ¶100:**

Campbell had reached out to Warstler multiple times between December 27, 2022, and January 25, 2023, and was now asking to continue their conversation about Campbell's accommodations and discuss her concerns about the HR process. Campbell copied LM's new CEO Timothy Sweeney ("Sweeney") and CPO Ughetta on these emails to Wartsler in an attempt to escalate her concerns.

**ANSWER:**

LM admits that Campbell emailed Warstler more than once between December 27, 2022, and January 25, 2023, to discuss her accommodations. LM further admits that Campbell copied CEO Sweeney and CPO Ughetta on some of these emails. LM denies the remaining allegations in Paragraph 100.

**COMPLAINT ¶101:**

Additionally, Campbell asked Warstler about what training HR and managers receive regarding ADA accommodations and how to support disabled workers, given that Long had previously stated that this was the most important part of supporting neurodivergent workers.

**ANSWER:**

LM admits that Campbell asked Warstler about ADA training for HR and managers. LM denies the remaining allegations in Paragraph 101.

**COMPLAINT ¶102:**

Warstler refused to reply to Campbell's emails until January 25, 2023.

**ANSWER:**

LM admits that Warstler replied to Campbell's emails on January 25, 2023, but denies

the remaining allegations in Paragraph 102.

**COMPLAINT ¶103:**

Campbell returned to work the next day and Warstler emailed her to simply share that her case had been closed, and that any further concerns should be brought to Russ.

**ANSWER:**

LM admits that Campbell returned to work on January 26, 2023, and that Warstler

emailed her on January 25, 2023, communicating again the accommodations that were provided,

and noting that any additional questions regarding workplace accommodations could be raised

with Russ. LM denies the remaining allegations in Paragraph 103.

**COMPLAINT ¶104:**

On January 26, 2023, Campbell returned to work, where Busby repeatedly refused to follow her approved accommodations, regularly put her into situations that Busby knew would worsen Campbell's symptoms, and attempted to paint Campbell as insubordinate when she refused to acquiesce to her discrimination.

**ANSWER:**

LM admits that Campbell returned to work on January 26, 2023. LM denies the

remaining allegations in Paragraph 104.

**COMPLAINT ¶105:**

On or about January 27, 2023, Campbell was in contact with Russ and attempted to continue the conversation that Warstler refused to have regarding the ineffective accommodations and remaining unaddressed accommodation requests. Campbell also asked Russ to answer a few questions about how Campbell was supposed to feel safe returning to work, and how her year-end review would be conducted in the coming days considering she *still* had an open discrimination investigation into her manager, Busby.

**ANSWER:**

LM admits that Campbell contacted Russ regarding questions on her accommodation requests on January 27, 2023. LM denies the remaining allegations in Paragraph 105.

**COMPLAINT ¶106:**

Russ claimed that all requested accommodations had been addressed and skirted around Campbell's questions, stating she would get back to her. When Campbell asked Russ to show her where in their communication had the last few requests been answered, [*sic*] but Russ never replied to this question. Russ did not get back to Campbell in a timely manner, and waited until February 3, 2023, to inform her that any questions about her year-end review should now be directed to Izard-Gibb.

**ANSWER:**

LM admits that Russ communicated that several of Campbell's accommodation requests, and LM's responses to the requests, were included in Russ's approval email, and that Russ asked several follow up questions of Campbell. LM further admits that Campbell asked Russ to "identify where in the attached 11/4 email you addressed certain accommodations." LM further admits that Russ replied on February 3, 2023, stating she was still reviewing her January 31, 2023 email, but that Campbell's performance review questions should be directed to Izard-Gibb. LM denies the remaining allegations in Paragraph 106.

**COMPLAINT ¶107:**

On or about February 3, 2023, Campbell received an email from a new HR person, Preeti Gupta ("Gupta"), stating she would be attending a few meetings with Busby and Campbell to act as a support person for Campbell.

**ANSWER:**

LM admits that Preeti Gupta advised Campbell that she would attend some meetings between Busby and Campbell on or around February 3, 2023. LM denies the remaining allegations in Paragraph 107.

**COMPLAINT ¶108:**

This came after Campbell refused to participate in a verbal call with Busby where she did not have a support person, and where permission to record the conversation was denied.

**ANSWER:**

LM admits that Campbell refused to participate in a verbal call with Busby without a support person and after her request to record the conversation was denied. LM denies the remaining allegations in Paragraph 108.

**COMPLAINT ¶109:**

Campbell was never told why the accommodation of having a support person present, which had been denied to her for months, was suddenly available. Campbell was not offered the chance to meet Gupta before Gupta was scheduled to attend a meeting between Campbell and Busby. Without ever meeting her designated support person, Campbell was unsure how supportive Gupta could be.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to Campbell's subjective feelings regarding Gupta. LM denies the remaining allegations in Paragraph 109.

**COMPLAINT ¶110:**

On or about February 3, 2023, Izard-Gibb reached out to Campbell and asked her to get on a verbal call with her to discuss the problems she was having with Busby since returning to work.

**ANSWER:**

LM admits that Izard-Gibb reached out to Campbell in early February 2023, and asked her to have a verbal call to address follow up questions related to her investigation. LM denies the remaining allegations in Paragraph 110.

**COMPLAINT ¶111:**

Campbell once again requested the accommodation of nonverbal communication, or the ability to record their call. Izard-Gibb initially refused both requests but later agreed to email Campbell instead of having a verbal call.

**ANSWER:**

LM admits that Campbell stated she wanted to utilize nonverbal communication with Izard-Gibbs. LM further admits that Izard-Gibb responded via email. LM denies the remaining allegations in Paragraph 111.

**COMPLAINT ¶112:**

Campbell informed Izard-Gibb of four occurrences over the past three weeks where she informed seven different LM employees of her fear and concerns around her return to work, and how every email went unaddressed. When Campbell also thanked Izard-Gibb for the nonverbal communication accommodation and requested that it be the standard going forward, Izard-Gibb threatened to not fully investigate Campbell's discrimination concerns if Campbell required the accommodation of nonverbal communication. This felt extremely coercive to Campbell, and she told Izard-Gibb that this threat was inappropriate and she would be taking her concerns to the EEOC for investigation.

**ANSWER:**

LM admits that Campbell told Izard-Gibb that she informed LM employees about her concerns and thanked her for communicating via email. LM further admits that Izard-Gibb told Campbell that she may need to speak with her over the phone to complete her investigation. LM lacks knowledge or information sufficient to form a belief as to Campbell's subjective feelings regarding these communications, but admits that Campbell stated she would take her concerns to the EEOC. LM denies all remaining allegations in Paragraph 112.

**COMPLAINT ¶113:**

Izard-Gibb did not reply to this. Campbell did not hear from her again until February 27, 2023, when Izard-Gibb emailed her that her case was closed and that no discrimination from Busby towards Campbell had been found.

**ANSWER:**

LM admits that Izard-Gibb responded to Campbell on February 27, 2023, stating that her investigation did not substantiate any policy violations. LM denies all remaining allegations in Paragraph 113.

**COMPLAINT ¶114:**

On February 6, 2023, Campbell was constructively discharged from LM due to the company's hostility and refusal to provide her with reasonable accommodations, HR's continuous refusal to have productive conversations about her accommodation requests, Busby's refusal to respect Campbell's approved accommodations, Campbell's mental health decline, and the clear manipulation attempts made by everyone involved in the process to paint her as insubordinate.

**ANSWER:**

Paragraph 114 contains a legal conclusion to which no response is required. To the extent a response is required, LM denies the allegations in Paragraph 114.

**COMPLAINT ¶115:**

Campbell continues to experience emotional distress and heightened symptoms of her disabilities due to the triggering nature of LM's actions. Her PTSD flashbacks have increased, and she experiences nightmares every night. Campbell also struggles with shame, and her self-image has decreased to the point of rarely leaving her house.

**ANSWER:**

LM denies that its conduct caused any emotional distress or damages and denies all remaining allegations in Paragraph 115.

**COMPLAINT ¶116:**

Campbell still attends therapy twice a week in an effort to correct the regression in her PTSD recovery that she experienced due to LM's unlawful actions. She struggles to enjoy her personal life and was recently unable to celebrate her one-year wedding anniversary due to her ongoing panic attacks and meltdowns, symptoms of her disabilities.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to Campbell's allegations regarding personal life events, but denies that LM's conduct caused any emotional distress or damages and denies all remaining allegations in Paragraph 116.

**COMPLAINT ¶117:**

Campbell scheduled an inquiry interview with the EEOC in November 2022 and took the first available date of April 26, 2023.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to the allegations in

Paragraph 117.

**COMPLAINT ¶118:**

Campbell was fearful of being harassed into quitting before the scheduled interview and attempted to obtain an earlier appointment with the EEOC in January 2023. Unfortunately, Campbell was unable to move up the date and was forced to represent herself against LM in her final weeks before her constructive discharge.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to Campbell's

subjective beliefs and her communications with the EEOC on or around January 2023. LM

denies Campbell was constructively discharged and denies all remaining allegations in Paragraph

118.

**COMPLAINT ¶119:**

On April 26, 2023, Campbell was called an hour ahead of schedule and was asked to conduct her interview. In this meeting, Campbell expressed to the EEOC representative that verbal communication was difficult for her, that she had a prepared timeline to read from, and that she would best represent herself if she was allowed to work through events in chronological order.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to the allegations in

Paragraph 119.

**COMPLAINT ¶120:**

The EEOC representative initially agreed to this request but later asked Campbell to stray from her prepared notes. Campbell was assured that her timeline and all other evidence could be uploaded into the EEOC portal and would be reviewed. Near the end of the interview, the EEOC representative told Campbell that she "probably didn't have a case that the EEOC would take on" because it appeared that LM "accepted at least a few" requested accommodations. Campbell became emotionally overwhelmed by this but confirmed with the EEOC that her full story would be heard through the evidence uploaded into the portal. The interview ended after an hour.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to the allegations in

Paragraph 120.

**COMPLAINT ¶121:**

Campbell signed the Charge of Discrimination (No. 2023CR1485, EEOC No. 440-2023-01671) on May 3, 2023, and began preparing to upload her evidence into the portal.

**ANSWER:**

Upon information and belief, Campbell signed her Charge of Discrimination on May 3,

2023. LM lacks knowledge or information sufficient to form a belief as to the remaining

allegations in Paragraph 121.

**COMPLAINT ¶122:**

On May 5, 2023, Campbell received a notice of case closure and a right to sue letter from the EEOC—all before Campbell uploaded any evidence into the portal.  (Attached as Exhibit A.)

**ANSWER:**

Upon information and belief, the EEOC issued its Notice of Right to Sue letter on May 5,

2023. LM lacks knowledge or information sufficient to form a belief as to the remaining

allegations in Paragraph 122.

**COMPLAINT ¶123:**

Campbell reached out to the representative she spoke to on April 26, 2023, and asked how her case was closed after less than two business days and when she had not yet uploaded the timeline and evidence she was assured would be reviewed.  The EEOC representative simply told Campbell that she could request an appeal and provide the additional evidence.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to the allegations in

Paragraph 123.

**COMPLAINT ¶124:**

Campbell did request an appeal, but this request was declined by the EEOC.

**ANSWER:**

  LM lacks knowledge or information sufficient to form a belief as to the allegations in

Paragraph 124.

**COMPLAINT ¶125:**

  Campbell continued her search for legal representation and was advised by an attorney she contacted to send her case to the IDHR for a second review.  Campbell contacted the IDHR on May 12, 2023, and requested an investigation

**ANSWER:**

  LM lacks knowledge or information sufficient to form a belief as to the allegations in

Paragraph 125.

**LEGAL CLAIMS**

**Count I**
**Violation of the Americans with Disabilities Act ("ADA")**
**42 U.S.C. §§ 12101 *et seq.***

  233. **Discrimination under the ADA**

**COMPLAINT ¶126:**

  Each paragraph of this Complaint is incorporated as if fully restated herein.

**ANSWER:**

  LM repeats and responds to each of the allegations above as though set forth herein.

**COMPLAINT ¶127:**

  Title I of the ADA prohibits private employers with at least 15 employees from discriminating against qualified individuals with disabilities. 42 U.S.C. §§ 12111, 12112.

**ANSWER:**

  LM admits that Paragraph 127 recites a portion of Title I of the ADA, but denies that it

violated Title I of the ADA, and denies all remaining allegations in Paragraph 127.

**COMPLAINT ¶128:**

LM employs more than 15 employees and is a covered "employer" within the meaning of the ADA. 42 U.S.C. § 12111(5).

**ANSWER:**

Paragraph 128 contains a legal conclusion to which no response is required. To the extent a response is required, LM admits that it employs more than 15 employees but denies that it violated this statute and denies all remaining allegations in Paragraph 128.

**COMPLAINT ¶129:**

At all relevant times, Campbell was a qualified individual with a disability within the meaning of the ADA. 42 U.S.C. § 12111(8).

**ANSWER:**

Paragraph 129 contains a legal conclusion to which no response is required. To the extent a response is required, LM admits that Campbell reported to have a disability but denies that it violated this statute and denies all remaining allegations in Paragraph 129.

**COMPLAINT ¶130:**

Campbell was a covered "employee" within the meaning of the ADA. 42 U.S.C. § 12111(4).

**ANSWER:**

Paragraph 130 contains a legal conclusion to which no response is required. To the extent a response is required, LM admits that Campbell was an "employee" within the meaning of the ADA, but denies that it violated this statute and denies all remaining allegations in Paragraph 130.

**COMPLAINT ¶131:**

At all relevant times, Campbell had mental disabilities that substantially limited one or more major life activities and qualified as a disability under the ADA. 42 U.S.C. § 12102(1). The major life activities that were substantially limited due to Campbell's mental disabilities included caring for herself, concentrating, learning, speaking, thinking, working, interacting with others, and more.

**ANSWER:**

Paragraph 131 contains a legal conclusion to which no response is required. To the extent

a response is required, LM admits that Campbell reported having disabilities but denies that it

violated this statute and denies all remaining allegations in Paragraph 131.

**COMPLAINT ¶132:**

Campbell's disabilities include Generalized Anxiety Disorder, Major Depressive
Disorder Recurrent Moderate, Post-Traumatic Stress Disorder, and Attention-Deficit
Hyperactivity Disorder.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to the allegations in

Paragraph 132, but acknowledges that Campbell reported having disabilities to LM.

**COMPLAINT ¶133:**

At all relevant times, Campbell could perform the essential functions of her position with
LM, with or without reasonable accommodations.  The essential functions of Campbell's
position included deconstructing insurance submissions by identifying, gathering, analyzing, and
entering information; providing customer service to brokers and agents to facilitate the
processing of business; executing post-sale management and workflow; and supporting the
underwriter with mid-term account services.  Busby also acknowledged that Campbell was
performing well and was competent in her work.  In fact, because Campbell could perform the
essential functions of her job without accommodations, LM perceived them as not being
necessary.

**ANSWER:**

Paragraph 133 contains a legal conclusion to which no response is required. To the extent

a response is required, LM admits that Paragraph 133 contains some of the essential functions of

Campbell's position, but denies that Paragraph 133 contains all essential functions of the position

and denies the remaining allegations in Paragraph 133.

**COMPLAINT ¶134:**

LM took adverse employment actions against Campbell by limiting the job
responsibilities she would have otherwise been assigned had she not disclosed her disabilities to
Busby.  They took further adverse employment actions by refusing to do a meaningful
investigation into Campbell's claims.

**ANSWER:**

Paragraph 134 contains a legal conclusion to which no response is required. To the extent a response is required, LM denies the allegations in Paragraph 134.

**COMPLAINT ¶135:**

The basis for LM's constructive discharge of Campbell was based on unlawful discrimination.

**ANSWER:**

Paragraph 135 contains a legal conclusion to which no response is required. To the extent a response is required, LM denies that Campbell was constructively discharged and denies all remaining allegations in Paragraph 135.

**COMPLAINT ¶136:**

Similarly situated employees who do not have a disability were not subjected to adverse employment actions in similar circumstances.

**ANSWER:**

Paragraph 136 contains a legal conclusion to which no response is required. To the extent a response is required, LM denies the allegations in Paragraph 136.

**COMPLAINT ¶137:**

Campbell's disability was a motivating factor in LM's decision to limit the scope of Campbell's job responsibilities.

**ANSWER:**

Paragraph 137 contains a legal conclusion to which no response is required. To the extent a response is required, LM denies the allegations in Paragraph 137.

**COMPLAINT ¶138:**

As a direct and proximate result of LM's unlawful actions against Campbell, in violation of the ADA, she has suffered, and continues to suffer, monetary and emotional damages.

**ANSWER:**

Paragraph 138 contains a legal conclusion to which no response is required. To the extent a response is required, LM denies the allegations in Paragraph 138.

233. **Failure to Accommodate under the ADA**

**COMPLAINT ¶139:**

Each paragraph of this Complaint is incorporated as if fully restated herein.

**ANSWER:**

LM repeats and responds to each of the allegations above as though set forth herein.

**COMPLAINT ¶140:**

LM was aware of Campbell's disabilities, as she had informed LM about them both over email and in person.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to which reported disabilities are being referenced in Paragraph 140, but admits that Campbell reported she had disabilities via email and in person.

**COMPLAINT ¶141:**

Campbell requested several reasonable accommodations, and LM failed to provide them. These requested accommodations included nonverbal communication. If nonverbal communication was not possible, Campbell requested the ability to record conversations for trainings and informative meetings, and to have a support person available in the event that she became nonverbal, a symptom of her disability.

**ANSWER:**

Paragraph 141 contains a legal conclusion to which no response is required. To the extent a response is required, LM admits that Campbell requested nonverbal communication, recording conversations, and having a support person, but denies the remaining allegations in Paragraph 141.

**COMPLAINT ¶142:**

LM refused these accommodations and stated that Underwriting Support Operations Manager, Kathy Tran ("Tran"), who was also Busby's supervisor, would sit in on meetings to support Campbell. Campbell was resistant to this alternative accommodation, as she originally expressed to Falconer on November 4, 2022, but HR refused to discuss it any further.

**ANSWER:**

LM admits that it offered Tran, both Busby's and Campbell's supervisor, as a support to

Campbell during meetings, and that Campbell was resistant to that accommodation. LM denies

the remaining allegations in Paragraph 142.

**COMPLAINT ¶143:**

Even when Tran joined Campbell's meetings with Busby, Tran did not support Campbell and instead made her feel even more scared and uncomfortable. Instead, Tran and Busby overtook meetings, even though Campbell was specifically told she would be the one leading. The two seemingly teamed up against Campbell and attempted to get her to sign a document that outlined the expectations of everyone involved in Campbell's trainings.

**ANSWER:**

LM admits that Tran joined some of Campbell's meetings with Busby, but lacks

knowledge or information sufficient to form a belief as to Campbell's feelings regarding her

presence. LM denies the remaining allegations in Paragraph 143.

**COMPLAINT ¶144:**

When Campbell asked questions before agreeing to sign the document, Tran cut her off. Tran told Campbell that she was bringing up inappropriate things (referring to Busby's intrusive questions and failure to support Campbell before she went on leave) that happened in the past. Tran attempted to get Campbell to agree to leave everything in the past and move on. This conversation took place while Campbell still had an open discrimination investigation against Busby. Campbell felt she was being coerced and pressured into signing documents and agreeing to no longer be impacted by the discrimination that was ongoing and still being investigated.

**ANSWER:**

LM admits that Campbell had a conversation with Tran while she had an open

investigation alleging discrimination against Busby. LM lacks knowledge or information

sufficient to form a belief as to Campbell's alleged feelings of coercion or pressure. LM denies

the remaining allegations in Paragraph 144.

## COMPLAINT ¶145:

During this meeting, Busby promised Campbell that she would not need to take notes, as Busby would be taking notes and would send them in a follow-up email after the call. However, Busby's follow-up email was missing important conversations from the meeting and appeared to be an attempt to control the narrative of the meeting.

## ANSWER:

LM admits that Campbell had a meeting with Tran and Busby. LM denies the allegations

in Paragraph 145.

## COMPLAINT ¶146:

After that meeting, and after Busby sent the follow-up email leaving important information from the meeting undocumented in her notes, Campbell was not willing to be in a verbal call with Busby without it being recorded or having a trained support person there.

## ANSWER:

LM lacks knowledge or information sufficient to form a belief as to whether Campbell

was unwilling to have a verbal call with Busby without it being recorded or having a trained

support person there after this meeting. LM denies the remaining allegations in Paragraph 146.

### Count II
### Violation of the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq. (2004)
### Discrimination Based on Disability

## COMPLAINT ¶147:

Each paragraph of this Complaint is incorporated as if fully restated herein.

## ANSWER:

LM repeats and responds to each of the allegations above as though set forth herein.

## COMPLAINT ¶148:

LM is an employer within the meaning of the IHRA. 775 ILCS 5/2-101(B)(1).

**ANSWER:**

Paragraph 148 constitutes a legal conclusion to which no response is required. To the extent a response is required, LM admits the allegations in Paragraph 148.

**COMPLAINT ¶149:**

At all relevant times, Campbell was an employee of Defendants as defined by the IHRA. 775 ILCS 5/2-101(A)(1)(a).

**ANSWER:**

Paragraph 149 constitutes a legal conclusion to which no response is required. To the extent a response is required, LM admits the allegations in Paragraph 149.

**COMPLAINT ¶150:**

At all relevant times, Campbell had a disability as defined by the IHRA. 775 ILCS 5/1-103(I). The Act defines "disability" as "a determinable physical or mental characteristic of a person, including, but not limited to, a determinable physical characteristic which necessitates the person's use of a guide, hearing or support dog, the history of such characteristic, or the perception of such characteristic by the person complained against, which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic. Includes any mental, psychological, or developmental disability, including *autism spectrum disorders*." 775 ILCS 5/1-103(I)(1)€ (emphasis added).

**ANSWER:**

Paragraph 150 constitutes a legal conclusion to which no response is required. To the extent a response is required, LM admits Paragraph 150 recites a portion of the IHRA, but LM denies it violated the IHRA and denies the remaining allegations in Paragraph 150.

**COMPLAINT ¶151:**

Campbell's disabilities, while significant, were unrelated to her ability to perform the duties of the job she was hired to perform. Campbell's disabilities had no impact on her ability to deconstruct insurance submissions by identifying, gathering, analyzing, and entering information; providing customer service to brokers and agents to facilitate the processing of business, executing post-sale management and workflow; and supporting the underwriter with mid-term account services.

**ANSWER:**

Paragraph 151 constitutes a legal conclusion to which no response is required. To the

extent a response is required, LM denies the allegations in Paragraph 151.

**COMPLAINT ¶152:**

Campbell requested reasonable accommodations from LM, such as having nonverbal
communication, recording trainings, neurodiversity awareness training for Campbell's team, and
more.

**ANSWER:**

Paragraph 152 constitutes a legal conclusion to which no response is required. To the

extent a response is required, LM admits Campbell requested nonverbal communication,

recording trainings, and neurodiversity awareness training, but denies the remaining allegations

in Paragraph 152.

**COMPLAINT ¶153:**

LM failed to provide the majority of the necessary accommodations Campbell requested.

**ANSWER:**

LM denies the allegations in Paragraph 153.

**COMPLAINT ¶154:**

Campbell had taken the necessary steps to request accommodations, but LM, its
managers, and HR personnel took an unreasonable amount of time to approve her requests and
failed to provide the necessary accommodations in a timely manner.

**ANSWER:**

LM denies the allegations in Paragraph 154.

**COMPLAINT ¶155:**

Busby took adverse actions against Campbell by limiting her responsibilities and
regarding Campbell as incapable of performing her job duties competently because of her
disabilities.

**ANSWER:**

LM denies the allegations in Paragraph 155.

**COMPLAINT ¶156:**

As a result of LM's conduct, Campbell had to add a second therapist to her medical team and now sees two therapists and a psychiatrist.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to whether Campbell

had to add a second therapist to her medical team or that she now sees two therapists and a

psychiatrist. LM denies its conduct resulted in any damages to Campbell and denies all

remaining allegations in Paragraph 156.

**COMPLAINT ¶157:**

Campbell has experienced depression, anxiety, shame, guilt, nightmares, PTSD flashbacks, emotional flashbacks, fatigue, loss of sleep, headaches, weight loss, meltdowns, uncontrollable crying, suicidal thoughts, difficulty concentrating, panic attacks, chronic body aches, isolation, and self-harm.

**ANSWER:**

LM lacks knowledge or information sufficient to form a belief as to Campbell's alleged

emotional distress, but denies LM caused any damages and denies all remaining allegations in

Paragraph 157.

**Count III**
**Violation of the Illinois Human Rights Act**
**Retaliation**

**COMPLAINT ¶158:**

Each paragraph of this Complaint is incorporated as if fully restated herein.

**ANSWER:**

LM repeats and responds to each of the allegations above as though set forth herein.

**COMPLAINT ¶159:**

Campbell engaged in numerous forms of protected activity during her employment with LM by requesting reasonable accommodations for her mental disabilities, calling attention to LM's discriminatory policies, and advocating for adequate training for those who manage or work with neurodivergent people.

**ANSWER:**

Paragraph 159 constitutes a legal conclusion to which no response is required. To the extent a response is required, LM admits that Campbell requested accommodations, stated she felt she was being discriminated against and requested training focused on neurodivergent people. LM denies the remaining allegations in Paragraph 159.

**COMPLAINT ¶160:**

Campbell suffered multiple adverse employment actions because of her protected activity.

**ANSWER:**

Paragraph 160 constitutes a legal conclusion to which no response is required. To the extent a response is required, LM denies the allegations in Paragraph 160.

**COMPLAINT ¶161:**

There is a causal connection between Campbell's protected conduct and LM's adverse action(s). After Campbell disclosed her disability to Busby, her job responsibilities were limited.

**ANSWER:**

Paragraph 161 constitutes a legal conclusion to which no response is required. To the extent a response is required, LM denies the allegations in Paragraph 161.

**COMPLAINT ¶162:**

Busby further retaliated by canceling Campbell's one-on-one meetings with her, meetings that were required of her as a manager of a new hire. When Campbell was on leave, HR required Busby to do weekly check-in texts with Campbell, which Busby failed to do.

**ANSWER:**

Paragraph 162 constitutes a legal conclusion to which no response is required. To the

extent a response is required, LM denies the allegations in Paragraph 162.

**COMPLAINT ¶163:**

Campbell was also subjected to multiple offensive and discriminatory comments about
her disability by her manager, her mentors, and even HR personnel.

**ANSWER:**

Paragraph 163 constitutes a legal conclusion to which no response is required. To the

extent a response is required, LM denies the allegations in Paragraph 163.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court find in her favor and against
Defendant as follows:

a. Declare that the acts and conduct of Defendants are unlawful;

b. Award Plaintiff the value of all compensation, benefits, and equity lost as a result
of Defendants' unlawful conduct;

c. Award Plaintiff the value of all compensation, benefits, and equity she will lose in
the future as a result of Defendants' unlawful conduct;

d. Award Plaintiff compensatory damages, including but not limited to, damages for
emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of
life, and other non-pecuniary losses;

e. Award Plaintiff punitive damages due to Defendants' malicious conduct and/or
Defendants' reckless or callous indifference to the statutorily protected rights of
Plaintiff;

f. Award Plaintiff prejudgment interest;

g. Award Plaintiff attorneys' fees, costs, and disbursements; and

h. Award Plaintiff such other make whole equitable, injunctive, and legal relief as
this Court deems just and proper.

**ANSWER:**

LM acknowledges Campbell seeks the relief outlined in the "Prayer For Relief," but denies that it engaged in any wrongdoing that would result in liability against LM or that Campbell is entitled to any relief whatsoever.

## AFFIRMATIVE AND OTHER DEFENSES

1.      Campbell's claim for damages must be barred to the extent Campbell has failed to mitigate her damages.

2.      To the extent Campbell has mitigated her damages, any award of damages that may be due to Campbell must be reduced by the amount of that mitigation.

3.      Campbell's claims are barred, in whole or in part, by the doctrine of unclean hands.

4.      Campbell's claims and/or damages may be barred and/or limited by the after-acquired evidence doctrine.

5.      Campbell cannot recover compensatory or punitive damages because LM will be able to demonstrate good faith efforts, in consultation with Campbell, to identify and make a reasonable accommodation that would provide Campbell with an equally effective opportunity and would not cause an undue hardship on the operation of LM's business.

6.      Campbell is not entitled to punitive damages or other damages because LM made good faith efforts to comply with all applicable statutes and common laws and acted at all times to protect Campbell's rights under the law.

7.      LM reserves the right to amend its Answer and to assert additional defenses or affirmative defenses that may become available or apparent at any future date.

8.      Any factual allegation not specifically denied in the body of Campbell's

Complaint is hereby denied.

DATED: November 17, 2023                    Respectfully submitted,

                                            LIBERTY MUTUAL GROUP INC.


                                            By:  *Kyla J. Miller*
                                                  One of Its Attorneys

Erin Dougherty Foley, Bar No. 06269791
edfoley@seyfarth.com
Kyla J. Miller, Bar No. 6327325
kjmiller@seyfarth.com

SEYFARTH SHAW LLP
233 South Wacker Drive
Suite 8000
Chicago, Illinois  60606-6448
Telephone:   (312) 460-5000
Facsimile:   (312) 460-7000

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was electronically

filed with the Clerk of the Court using the CM/ECF system, and that a copy of the foregoing was

served on all counsel of record via the Court's CM/ECF system, on November 17, 2023.


        *Kyla J. Miller*